**LEAGUE OF WILDERNESS DEFENDERS/BLUE MOUNTAINS BIODIVERSITY PROJECT, an Oregon nonprofit corporation; Kettle Range Conservation Group, a Washington nonprofit corporation; The Lands Council, a Washington nonprofit corporation; Hells Canyon Preservation Council, an Oregon nonprofit corpo-**

ration; Oregon Natural Resources Council, an Oregon nonprofit corporation; American Lands, an Oregon nonprofit corporation; and Northwest Ecosystem Alliance, a Washington nonprofit corporation, Plaintiffs,

v.

Harv FORSGREN, in his official capacity as Regional Forester, Pacific Northwest Region, U.S. Forest Service, an agency of the United States; and United States Forest Service, an agency of the United States, Defendants.

No. CV 00–1383–RE.

United States District Court,
D. Oregon.

May 7, 2001.

1224

Marianne Dugan, Eugene, OR, Lauren C. Regan, Eugene, OR, Brent Foster, Portland, OR, for Plaintiffs.

Kristine Olson, U.S. Attorney, Thomas C. Lee, Assistant U.S. Attorney, Portland, OR, Val J. McLam Black, Special Assistant U.S. Attorney, Office of General Counsel, USDA, Portland, OR, for Defendants.

## OPINION

REDDEN, District Judge.

### *INTRODUCTION*

Plaintiffs challenge defendants' Douglas Fir Tussock Moth (DFTM) Final Environmental Impact Statement (EIS) and May 26, 2000 Record of Decision (ROD) regarding the aerial spraying of approximately 628,000 acres in national forests in Oregon and Washington to control the DFTM. Plaintiffs argue that the spray project violates the National Environmental Policy Act (NEPA) and the Federal Water Pollution Control Act (commonly known as the Clean Water Act and hereafter referred to as the CWA).

### *PLAINTIFFS' COMPLAINT*

In their summary judgment motion, plaintiffs generally summarize the claims in their complaint as follows:

(1) The EIS fails to cite to any baseline studies, and fails to adequately document impacts of the proposed spraying of B.t.k. (*Bacillus thuringensis* var. *kurstaki*) and TM–BioControl on butterflies, wildlife, humans, and other aspects of the environment;

(2) Defendants have improperly characterized the situation as an emergency, and have by that characterization exempted themselves from the normal administrative stay provisions;

(3) The DFTM project leaves too many decisions up to the individual forest supervisors, even though the EIS acknowledges that its assumption of low impact to the environment relies heavily on only very limited spraying occurring under very stringent conditions;

(4) The EIS fails to (a) acknowledge the benefits of allowing the naturally-occurring DFTM to run its cycle; (b) disclose and analyze the effects of DFTM suppression on natural thinning of overstock stands and on birds and other wildlife; and (c) disclose the possibility that the suppression effort could lead to elimination or severe reduction of the DFTM virus, which is the DFTM's most effective natural regulator; and

(5) Defendants have violated the CWA by discharging pollutants into the waters of the United States without a permit.

Plaintiffs also request that the court enjoin defendants from (a) taking any further

action on the DFTM project unless or until they prepare an adequate supplemental environmental impact statement spraying that corrects deficiencies in the EIS and includes information on recent survey data; (b) "applying pollutants in National Forest waterways in such a manner as to result in a further violation of the CWA" (Pl.Compl., p. 12); and (c) discharging pollutants without the appropriate permit issued under the CWA.

## BACKGROUND

The following background comes from the (1) Draft Environmental Impact Statement (DEIS) published in January 2000 (AR 3395, hereafter DEIS/AR 3395); (2) the EIS published in April 2000 (AR 5099, hereafter EIS/AR 5099); (3) the ROD signed in May 2000 (AR 5533, hereafter ROD/AR 5533); and (4) the second Record of Decision signed in November 2000 (AR 5719, hereafter ROD2/AR 5719).

### A. DFTM and Outbreaks.

The DFTM is a tree defoliator which, in its larval stage, eats the needles of live Douglas fir and true fir trees. The DFTM is endemic in the forest and cyclic, with populations increasing to epidemic levels roughly every 7 to 13 years. Outbreaks may be localized or widespread, last for 2 to 4 years, and end with a sudden crash. EIS/AR 5099 at I–3. Since the female moth is incapable of flight, DFTM outbreaks generally arise in place, with little or no spread to uninfested or previously treated areas. Id.

The window of opportunity for effective spraying is the second year of a DFTM outbreak. EIS/AR 5099 at I–3. After two years of high DFTM populations, it is too late to spray because the populations will soon experience a natural crash and defoliation has already occurred. Id. For treatment to be effective, it must occur from mid-June to mid-July when larvae are ac-

tively feeding and before heavy defoliation becomes apparent. Id.

In the early 1970s, approximately 700,-000 acres were defoliated in Oregon, Washington, and Idaho due to an outbreak of DFTM. The outbreak caused total mortality in approximately 17,270 acres in patches, 75 percent mortality in approximately 62,070 acres, and 10 percent mortality approximately 275,660 acres. EIS/AR 5099 at I–4.

After the outbreak in the 1970s, the United States Forest Service (USFS) developed a DFTM early warning system, which is a survey technique used to monitor population trends of DFTM in forests throughout eastern Washington and Oregon. The early warning system allows the USFS to evaluate potential impacts of a DFTM outbreak on specific areas of the forests where foliage protection might be critical. EIS/AR 5099 at I–3. Under the early warning system, DFTM traps are placed in forests throughout eastern Washington and Oregon. Generally speaking, the number of captured male moths helps gauge the overall moth populations. Ground sampling is initiated when average capture exceeds 40 moths per trap. Id.

Based on early warning data, the USFS found that populations of DFTM were increasing, resulting in the USFS anticipating a widespread outbreak of DFTM on nine national forests in Washington and Oregon, primarily in years 2000–2002 and possibly through 2004. EIS/AR at I–3. It was the opinion of the USFS that this outbreak could cause defoliation similar to the 1970s outbreak. Id.

### B. B.t.k. and TM–BioControl.

The EIS evaluates two methods of control of DFTM: spraying with B.t.k. and spraying with TM–BioControl. B.t.k. is a bacterium naturally occurring in the soil. It kills only Lepidoptera (moths and but-

terflies). EIS/AR 5099 at I–5. B.t.k. formulas are complex. EIS/AR 5099 at IV–49.

TM–BioControl is a viral insecticide that contains only the natural DFTM virus and ground-up insect body parts (infected caterpillars), and is mixed primarily with water, molasses, a sunscreen, and a sticker. It kills only the DFTM and two other species of western tussock moths. EIS/AR 5099 at I–5.

**C. USFS Proposal.**

In June 1999, the USFS initiated a proposal to manage the anticipated DFTM outbreak by publication of a Notice of Intent to Prepare an Environmental Impact Statement in the Federal Register. EIS/AR 5099 at I–6.

Each of the nine national forests expecting a DFTM outbreak sent a scoping letter describing the proposal to individuals, organizations, businesses, and government agencies. EIS/AR 5099 at I–6 and App. C.

The USFS noted that it did not intend to attempt to stop or prevent the overall DFTM outbreak, or to prevent defoliation over the entire 4.2 million acres where the outbreak could potentially occur. EIS/AR 5099 at I–4. The USFS also noted that the DFTM would act as a natural disturbance agent by reducing overstocking and creating stand openings, but that defoliation in some areas would cause unacceptable harm to fish and wildlife habitat or to areas where people live and work. EIS/AR 5099 at I–3; ROD/AR 5533 at 1.

**D. Draft Environmental Impact Statement (DEIS).**

The DEIS was published in January 2000, and designated seven alternative proposed actions, four of which were eliminated from detailed consideration. DEIS/AR 3395. The following three alternatives were considered in detail in the DEIS:

Alternative 1 was to spray either B.t.k. and/or TM–BioControl on nine national forests, primarily through the air, on ecologically sensitive lands where defoliation would affect threatened and endangered fish and wildlife habitats, recreation areas, and other high value areas. DEIS/AR 3395 at I–3. This alternative identified approximately 560,000 acres that could be treated, although it was expected that treatment would actually occur on 224,000 to 336,000 acres. DEIS/AR 3395 at II–5.

Alternative 2 was to spray additional acres of host type forests in nine national forests that could be affected by a DFTM outbreak. This alternative would spray as much as 2.5 million acres. DEIS/AR 3395 at II–6.

Alternative 3 was the "no action" alternative under which there would be no spraying of areas threatened by defoliation by the DFTM during the expected outbreak. DEIS/AR at II–12.

**E. Final Environmental Impact Statement (EIS).**

Following public comment on the DEIS, the EIS was published in April 2000. In response to comments on the DEIS, the EIS (1) clarified the proposed action; (2) added additional details on TM–BioControl and B.t.k.; (3) analyzed in detail an additional alternative; (4) dropped other alternatives; and (5) added information on fish and wildlife species, tussock moth outbreaks, non-target Lepidoptera, and wildlife that eat moths and butterflies. Responses to public comments on the DEIS are listed in Appendix C of the EIS, and changes made to the EIS in response to public comments are summarized at I–1, II–1, III–2, and IV–4 of the EIS.

The four alternatives analyzed in the EIS were the No Action alternative (similar to Alternative 3 in the DEIS), Proposed Action alternative (similar to

Alternative 3 in the DEIS), Expanded Protection alternative (similar to Alternative 2 in the DEIS), and TM–BioControl Only alternative. The TM–BioControl Only alternative had not been considered in the DEIS in detail; the EIS included a detailed consideration of this alternative based on public comments on the DEIS that requested such consideration. EIS/AR 5099 at II–1.

The EIS stated that B.t.k. and TM–BioControl would be sprayed primarily from helicopters, although ground application could occur in specific areas such as seed orchards. EIS/AR 5509 at I–6. Aerial spraying would involve a single application by a helicopter flying 50 to 75 feet above the treetops with an average swath width of about 90 feet, resulting in only a momentary presence of the aircraft at any location. EIS/AR 5099 at II–7.

### F. First Record of Decision (ROD).

The Regional Forester signed the first ROD in May 2000, indicating his selection of the Proposed Action alternative identified the EIS. The ROD also contained the Regional Forester's decision that only TM–BioControl would be used until the supply was exhausted, and that enough TM–BioControl would be reserved to meet mitigation obligations identified in the EIS. ROD/AR 5533 at 3.

The Regional Forester concluded that the Proposed Action alternative would protect "specific Areas of Concern, as identified in the project objectives, from defoliation." ROD/AR 5533 at 1. The Proposed Action alternative covered Areas of Concern that encompassed 628,000 acres. "Areas of Concern" are mapped areas in each of nine national forests where DFTM defoliation would change or jeopardize vegetative conditions in threatened and endangered species habitat, health and safety areas, campgrounds, or scenic viewsheds, or where the USFS had made a substan-

tial investment such as a seed orchard. EIS/AR 5099 at I–4 to I–5. The EIS contains a list of the specific areas included in the Areas of Concern, with acreages for each forest in the project area. EIS/AR 5099 at Table II–1. Actual spraying would be limited to where increasing DFTM populations, as determined by trapping and ground surveys, intersected with Areas of Concern. ROD/AR 5533 at 2, 3.

Although the EIS covered nine national forests, the ROD authorized spraying on portions of only six national forests in Oregon and Washington (Colville, Umatilla, Wallowa–Whitman, Malheur, Ochoco, and Fremont). ROD/AR 5533 at 1. A second record of decision covering the remaining three national forests was to be issued after completion of additional formal and informal Endangered Species Act consultations with the U.S. Fish and Wildlife Service (US/FWS). ROD/AR 5533 at 3.

In the ROD, the Regional Forester identified mitigation measures to protect against adverse effects from the project. ROD/AR 5533 at 4. Those mitigation measures included:

(1) Application of TM–BioControl only on (a) andromous fish and bull trout habitat; (b) known Mardon skipper colonies in proposed protection areas in Klamath County; (c) a 1 mile buffer along wilderness boundaries adjacent to Areas of Concern; and (d) a 1.75 mile radius around known or potential Townsend's big-eared bat maternity sites.

(2) Avoidance of treatment in (a) a½ to 1 mile buffer around active bald eagle nests; and (b) a 1 mile buffer around active Peregrine falcon nests. *Id.*

The ROD also provided for implementation and effectiveness monitoring as outlined in Appendix I of the EIS, including the following: (A) DFTM populations; (B) severity and location of defoliation; (C)

effects on riparian vegetation (because defoliation and tree mortality affects stream shading); (D) effects on bald eagle nesting stands from defoliation (under the mitigation measures, treatment is avoided in all nest sites); (E) human health and safety impacts on forest visitors and workers; and (F) where B.t.k. is used and populations of sensitive plant species are known, the effects on seed production in sensitive plants. ROD/AR 5533 at 4; EIS/AR 5099 at App. I.

### G. *Emergency Exemption and 2000 Spraying.*

In November 1999, the USFS Deputy Chief granted a request for an emergency exemption from the automatic stay of implementation during administrative appeals. AR 2636. Pursuant to the exemption, in June and July of 2000, 39,392 acres in the Umatilla and Wallowa–Whitman National Forests were sprayed with TM–Bio-Control.

The ROD noted that the emergency exemption from automatic stay during administrative appeals applied to the spray project only for the year 2000. ROD/AR 5533 at 10.

### H. *Second Record of Decision.*

A second Record of Decision authorizing the spray project was signed in November 2000, and covered those remaining three national forests for which Endangered Species Act consultations had to be completed with the US/FWS. ROD2/AR 5719.

### I. *Plaintiffs' Appeal.*

Plaintiffs' administrative appeal of the ROD was received by the USFS Chief on July 18, 2000, and the Chief upheld the ROD on August 23, 2000. AR 5647–51; AR 5652–58.

### SUMMARY OF OUTSTANDING MOTIONS

The following motions are before this court:

1. Defendants' motion to strike certain materials submitted by plaintiffs in support of their motion for summary judgment;

2. Plaintiffs' and defendants' cross-motions for summary judgment on the CWA and NEPA claims; and

3. Defendants' motion to dismiss plaintiffs' CWA claim for lack of subject matter jurisdiction.

### DEFENDANTS' MOTION TO STRIKE

Defendants move to strike the following materials submitted by plaintiffs in support of their motion for summary judgment:

(1) Declaration of Brent Foster, Exhibits B and C;

(2) Declaration of Marianne Dugan, paragraphs 2, 3, and 6 11; and

(3) Second Declaration of Asante Riverwind.

As discussed below, I am granting defendants' motion to strike as to all three declarations; however, I note that my conclusions on the cross-motions for summary judgment would not change even if the declarations were not stricken.

### A. *Declaration of Brent Foster.*

#### 1. *Defendants' Arguments.*

Defendants move to strike Exhibits B and C to the Declaration of Brent Foster dated February 5, 2001, which are two scientific studies about B.t.k. drift that were referred to in Washington Department of Fish and Wildlife comments on the DEIS, but not provided to the USFS by any of the plaintiffs or any other commenters. The Washington Department of

Fish and Wildlife had requested in its comments that B.t.k. drift be addressed in the EIS with respect to impacts on non-target species.

Defendants argue that although the USFS reviewed many scientific publications in its preparation of the EIS (EIS/AR 5099 at References Cited, pp. 1–11), it is not incumbent upon the USFS to review documents that are mentioned in passing but not submitted to it. Defendants also argue that these studies do not come within the narrow circumstances in which the Ninth Circuit has allowed extra-record review (discussed in Section A3 directly below).

### 2. *Plaintiffs' Response.*

Plaintiffs argue that the studies contained in Exhibits B and C are also part of the administrative record even though their text is not physically within the record. Plaintiffs argue that the administrative record is not just those documents that the agency has compiled and submitted as the administrative record, but also includes all documents and materials directly or indirectly considered by agency decision-makers, citing *Thompson v. U.S. Dept. of Labor*, 885 F.2d 551, 555 (9th Cir.1989) (letters sent to administrative law judge included in administrative record).

### 3. *Discussion.*

 A reviewing court is limited solely to what is contained in the administrative record in order to determine whether defendants' "decision was based on the consideration of the relevant factors and whether there has been a clear error of judgment." *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971), *overruled on other grounds by Califano v. Sanders*, 430 U.S. 99, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977). However, the whole administrative record is not necessarily only those docu-ments that the agency has compiled and submitted as the administrative record. *Thompson v. U.S. Dept. of Labor*, 885 F.2d at 555. Plaintiffs are correct that the whole administrative record consists of all documents and materials directly or indirectly considered by the agency decision-makers. *Id.*

The Ninth Circuit has allowed extra-record review in several circumstances: (a) the district court may obtain additional explanations from the agency when the agency's failure to explain its action effectively frustrates judicial review; (b) the district court may inquire outside of the administrative record when it appears that the agency has relied on documents or materials not included in the administrative record; (c) the district court may permit discovery if supplementation of the record is necessary to explain technical terms or complex subject matter involved in the agency action; or (d) the district court may inquire outside of the administrative record when there is a strong showing of bad faith or improper behavior by the agency. *Animal Defense Council v. Hodel*, 840 F.2d 1432, 1436–38 (9th Cir. 1988), *modified by* 867 F.2d 1244 (9th Cir. 1989).

Plaintiffs do not make arguments that fit Exhibits B and C into any one of these exceptions. Rather, plaintiffs' position appears to be that the USFS ignored or inadequately considered these studies in preparation of the EIS, so they must now be included in the administrative record and considered by this court. This is not one of the exceptions to the general rule that the review of agency action is limited to the administrative record.

 Further, it is not a violation of NEPA for the EIS to rely on particular scientific methodologies and studies instead of others. *Friends of Endangered Species, Inc. v. Jantzen*, 760 F.2d 976, 986

(9th Cir.1985); *see also,* 40 C.F.R. § 1502.24. The agency's choice of studies on which to rely is within its discretion, and courts are precluded from reviewing such decisions unless they are found to be arbitrary or capricious. 5 U.S.C. § 706(2)(A). In this case, the EIS lists approximately 230 studies that were relied upon and cited in the EIS. EIS/AR 5099 at References Cited, pp. 1–11. The USFS had the discretion to chose these 230 studies as the basis of the EIS and to fail to include, for example, the two studies referenced in the Washington Department of Fish and Wildlife comments that plaintiffs now seek to become part of the record in this case.

Plaintiffs' arguments are not sufficient to permit this court's review of evidence that was not physically included in the administrative record, but was merely referred to in comments on the DEIS. Plaintiffs' reliance on *Thompson* is misplaced because *Thompson* involved evidence that fit within the second of the exceptions permitted by the Ninth Circuit.

Defendants' motion to strike Exhibits B and C to the Declaration of Brent Foster is granted.

## B. *Declaration of Marianne Dugan.*

### 1. *Defendants' Arguments.*

Defendants move to strike paragraphs 2, 3, and 6–11 of the Declaration of Marianne Dugan dated February 5, 2001. In these paragraphs, Ms. Dugan purports to analyze and summarize 1999 raw data from the early warning system that plaintiffs received pursuant to a Freedom of Information Act (FOIA) request. Ms. Dugan admits in her declaration that she is not an expert in analyzing raw data and that her analysis is based entirely on "simple math."

Defendants argue that Ms. Dugan draws conclusions in her declaration that are simply incorrect, and that summarizing raw data and drawing statistically valid conclusions therefrom do not involve "simple math." Defendants submit the declaration of Iral Ragenovich, the entomologist on the interdisciplinary team for the DFTM EIS, to explain why Ms. Dugan's conclusions are "completely flawed." Def. Memo., p. 3. Ms. Ragenovich opines that Ms. Dugan's declaration indicates that

> "she is not familiar either with the biology or the population dynamics of the Douglas-fir tussock moth, and is not qualified to interpret data concerning the tussock moth. As a result, she has drawn completely erroneous conclusions about the Douglas-fir tussock moth populations and the Early Warning Trapping System."

Ragenovich Declar., p. 3.

### 2. *Plaintiffs' Response.*

Plaintiffs' response to the motion against Ms. Dugan's declaration is combined with, and therefore identical to, their response to defendants' motion against the Second Declaration of Asante Riverwind, discussed in Section C below.

In their response, plaintiffs argue that the Declaration of Marianne Dugan and the Second Declaration of Asante Riverwind are properly included in the court's review even though they are materials outside of the administrative record compiled by the USFS. They assert that both declarations qualify under two of the exceptions developed by the Ninth Circuit regarding allowance of extra-record review. First, plaintiffs argue that this court may inquire outside of the administrative record in this case because it appears that the agency has relied on documents or materials not included in the administrative record. Presumably, plaintiffs are referring to the analyses of defendants' experts of the 1999 early warning system raw data. Second, plaintiffs argue that the material in Ms.

Dugan's and Mr. Riverwind's declarations is necessary to explain technical terms or complex subject matter involved in the agency action.

Plaintiffs also argue that the two declarations are not unsupported expert testimony, as argued by defendants. Rather, they are attempts by Ms. Dugan and Mr. Riverwind to interpret the government's documents, just as the public is called upon to do when trying to understand the EIS. Plaintiffs argue that "if three lawyers and an executive director of a non-profit organization [Mr. Riverwind] cannot make sense of the project, the documentation is not clear and violates NEPA." Pl. Reply., p. 24. Thus, plaintiffs appear to be raising an issue under NEPA's "readability" requirement, *i.e.*, that the EIS be clear, readable, presented in plain language, presented in a clear format, and organized and written so as to be readily understandable by governmental decision-makers and interested non-professional laypersons likely to be affected by actions taken under the EIS. *Environmental Council v. Kunzman*, 817 F.2d 484, 493–94 (9th Cir.1987).

### 3. *Discussion.*

■ Neither the Declaration of Marianne Dugan nor the Second Declaration of Asante Riverwind, discussed briefly below in Section C, fall within the exceptions developed by the Ninth Circuit regarding extra-record review. The declarations do not contain material the USFS relied upon in preparation of the EIS, nor do they contain necessary explanations of technical terms or complex subject matter.

■ Both declarations focus on the justifications for and operational details of the 2000 spraying project. The 2000 spray project is not before this court, except with respect to plaintiffs' allegations that the declaration of an emergency that permitted the spraying in 2000 was improper. As discussed below in the section on the emergency declaration, the 2000 spray project has been completed; the emergency declaration has expired; and plaintiffs have not identified a remedy this court could provide with respect to the emergency declaration; as a result, plaintiffs' and defendants' cross-motions for summary judgment on the issue of the emergency declaration are moot. It follows, then, that documents and information about the justifications for and operational details of the 2000 spray project are properly not a part of the administrative record in this case, and are properly not before this court.

■ As to readability, the EIS must be organized and written so as to be readily understandable by governmental decision-makers and interested non-professional laypersons. *Environmental Council v. Kunzman*, 817 F.2d at 494. The main text of an EIS will routinely include some scientific data, but overly technical material and supporting data should ordinarily appear in appendices. *Id.* A reviewing court must read the EIS and make a pragmatic judgment as to its readability. *Id.* I have read the EIS in this case, and it is my pragmatic judgment that the body of the document is clearly organized and sufficiently well written. There is no violation of the "readability" rule here.

■ I also conclude that Ms. Dugan and Mr. Riverwind's declarations are not competent evidence because they attempt to interpret technical scientific raw data, and neither of Ms. Dugan nor Mr. Riverwind has made a showing that they have the expertise to engage in such interpretations. The interpretation of raw data is part of the science of statistics, and the USFS is entitled to rely on the reasonable conclusions of its own experts to determine what that data means and how it affects the decision of what should be sprayed. *Headwaters, Inc. v. Bureau of Land Man-*

*agement,* 914 F.2d 1174, 1180 (9th Cir. 1990). Defendants' motion to strike paragraphs 2, 3, and 6–11 of the Declaration of Marianne Dugan and the Second Declaration of Asante Riverwind is granted. Mr. Riverwind's declaration is discussed briefly below.

## C. Second Declaration of Asante Riverwind.

### 1. Defendants' Arguments.

Defendants move to strike the Second Declaration of Asante Riverwind dated January 29, 2001. Mr. Riverwind states in his declaration that he has examined cocoon and larvae surveys received in response to FOIA requests and concludes that in 2000, defendants sprayed areas without surveying DFTM levels. Mr. Riverwind also states that Roger Sandquist, an entomologist with the USFS, told him on the telephone that unsurveyed areas were sprayed in 2000.

As with Ms. Dugan's declaration, defendants argue that Mr. Riverwind attempts to interpret raw data without any showing of qualification or expertise. In support of this argument, defendants submit a declaration from Dr. Sandquist wherein Dr. Sandquist states that Mr. Riverwind draws unsupported conclusions in his declaration because he does not understand the sampling protocols.

Defendants also argue that Mr. Riverwind's declaration should be stricken because it purports to relay the words of Dr. Sandquist, which is hearsay and improper in a case involving record review only.

### 2. Plaintiffs' Response.

Plaintiffs' response to the motion against Mr. Riverwind's second declaration was combined with, and is therefore identical to, their response to the motion against Ms. Dugan's declaration, discussed in Section B3 above.

### 3. Discussion.

For the reasons discussed above in Section B3, defendants' motion to strike the Second Declaration of Asante Riverwind is granted.

## CROSS MOTIONS FOR SUMMARY JUDGMENT

Plaintiffs and defendants cross-move for summary judgment on the issues of: (1) whether the declaration of an emergency was proper; (2) whether the aerial spraying of pesticides without a permit violates the CWA; and (3) whether the EIS violates NEPA.

### A. Summary Judgment Standards.

Federal Rule of Civil Procedure 56(c) authorizes summary judgment if no genuine issue exists regarding any material fact and the moving party is entitled to judgment as a matter of law. The moving party must show an absence of an issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the moving party shows the absence of an issue of material fact, the non-moving party must go beyond the pleadings and designate specific facts showing a genuine issue for trial. *Id.* at 324, 106 S.Ct. 2548. A scintilla of evidence, or evidence that is merely colorable or not significantly probative, does not present a genuine issue of material fact. *United Steelworkers of Am. v. Phelps Dodge Corp.,* 865 F.2d 1539, 1542 (9th Cir.), *cert. denied,* 493 U.S. 809, 110 S.Ct. 51, 107 L.Ed.2d 20 (1989).

The substantive law governing a claim or defense determines whether a fact is material. *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n,* 809 F.2d 626, 630 (9th Cir.1987). The court must view the inferences drawn from the facts in the light most favorable to the non-moving party. Thus, reasonable doubts about the

existence of a factual issue should be resolved against the moving party. *Id.* at 630–31. However, when the non-moving party's claims are factually implausible, that party must come forward with more persuasive evidence than would otherwise be required. *California Architectural Bldg. Prods., Inc. v. Franciscan Ceramics Inc.*, 818 F.2d 1466, 1470 (9th Cir.1987), *cert. denied,* 484 U.S. 1006, 108 S.Ct. 698, 98 L.Ed.2d 650 (1988). The Ninth Circuit has stated, "No longer can it be argued that any disagreement about a material issue of fact precludes the use of summary judgment." *Id.* at 1468.

**B.** **Declaration of Emergency.**

■ Plaintiffs attack the emergency declaration of the USFS Deputy Chief that permitted the 2000 spraying before resolution of plaintiffs' administrative appeal of the ROD. Pursuant to the emergency declaration, TM–BioControl was sprayed on 39,392 acres of the Umatilla and Wallowa–Whitman National Forests in June and July of 2000.

**1.** **Legal Standards.**

"Automatic stay of implementation" means that, unless the USFS Chief declares an "emergency," the project is stayed and the USFS does not have the authority to implement a project until after the appeal process has been completed. 16 U.S.C. § 1612; 36 C.F.R. § 215.10. An "emergency" is "an unexpected event, or a serious occurrence or a situation requiring urgent action." 36 C.F.R. § 215.10(d)(1).

**2.** **Plaintiffs' Arguments.**

Plaintiff's argue that USFS Deputy Chief's declaration an emergency, which created the exemption from the automatic stay of implementation, was improper and unfounded. According to plaintiffs, the Deputy Chief's declaration was based upon insufficient information to justify a conclusion that an emergency existed. Plaintiffs argue that the declaration resulted in a purposeful thwarting of an appeals process that is designed to allow the public to bring any objections to the attention of the USFS before the agency renders a final decision.

Plaintiffs contend that this court must determine whether the Deputy Chief's emergency declaration was based on a consideration of the relevant factors, and whether there was a clear error in judgment that makes the declaration arbitrary and capricious.

**3.** **Defendants' Arguments.**

Defendants argue that, since the ROD provided that the emergency exemption was applicable only to spraying in the year 2000 (ROD/AR 5533 at 10) and the year 2000 spraying under the exemption has been completed, any claim concerning the exemption is now moot. The challenged action is incapable of repetition, and the emergency exemption expired 15 days following disposition of the administrative appeal in August 2000.

. Defendants also contend that plaintiffs have not articulated, either in their complaint or their summary judgment motion, what relief this court can provide even if the emergency declaration had been improper.

Defendants also argue that plaintiffs waived their right to challenge the 2000 exemption when they did not pursue the issue in *League of Wilderness Defenders v. Forsgren,* CV 00–742–AS (D.Or.), a lawsuit that plaintiffs filed within days of the ROD was published in May 2000. Since the 2000 spraying did not begin until June 16, 2000, plaintiffs could have sought a temporary restraining order or preliminary injunction on the basis of their allegations of an unfounded emergency. In not doing so, defendants argue that they waived any challenge to the 2000 exemption.

Lastly, defendants dispute the claims made by plaintiffs regarding the justifications for emergency exemption, and argue that the exemption was well founded. Since June 2000 was the "latest ... that treatment would be effective to reduce defoliation of valuable sites in 2000" (AR 2422), and the administrative appeal would not be resolved until after June 2000, the emergency exemption was necessary to ensure that treatment was not delayed until June 2001.

### 4. *Discussion.*

Because plaintiffs do not articulate what relief they seek; the emergency declaration applied only to the year 2000; and the emergency declaration expired in August of 2000, plaintiffs' and defendants' cross-motions for summary judgment on the emergency declaration are denied as moot.

## C. *Violation of CWA.*

 Plaintiffs and defendants cross-move for summary judgment on the issue of whether the spray project violates the CWA. The specific issue is whether the aerial spraying of B.t.k. and TM–BioControl constitutes "the discharge of a pollutant" without a National Pollutant Discharge Elimination System (NPDES) permit in violation of Section 301(a) of the CWA.

### 1. *Legal Standards.*

Section 301(a) of the CWA provides that, without a NPDES permit, "the discharge of any pollutant by any person shall be unlawful." 33 U.S.C. § 1311(a). The CWA defines "discharge" as "any addition of [a] pollutant to navigable waters from any point source." 33 U.S.C. § 1362(5), (6), (7), (12)(A), (14) & (16).

In order to establish a violation of the CWA, a plaintiff must prove that (a) defendants are "persons," (b) who discharged and/or will discharge, (c) a "pollutant," (d) from a "point source," (e) into the "navigable waters of the United States," and (f) the discharge was not authorized under an NPDES permit. 33 U.S.C. § 1311(a).

### 2. *Plaintiffs' Arguments.*

Plaintiffs focus on the point source requirement. Plaintiffs argue that the proposed spray project violates Section 301(a) of the CWA because it will result in the discharge of insecticides from a point source into streams and rivers without a NPDES permit. There is no dispute that defendants do not have, and have not applied for, a NPDES permit with respect to the spray project.

Plaintiffs argue that it cannot be disputed that pesticides will be discharged into navigable waters, pointing out that the EIS acknowledges that "[s]ome of the proposed protection areas [*i.e.*, spray areas] are along streams and bodies of water"; that "[i]nsecticide application along streams could result in some spray deposited directly into the water"; and that because of the introduction of B.t.k. into streams, "[i]t is prudent to assume that there could be mortality [of aquatic insects] associated with using B.t.k." EIS/AR 5099 at IV–15 and IV–35.

Plaintiffs argue that insecticides will reach streams and rivers in two distinct ways: via direct application and via drift. With respect to direct application, the spray project will involve the aerial application of insecticides using a "boom" attached to a helicopter on a maximum of 628,000 acres of forest that include 942 miles of stream-side habitat. Because defendants have not established no-spray buffers around streams when insecticides are applied to riparian lands immediately adjacent to the streams, plaintiffs argue that this is a direct discharge of pesticides from a "point source" into streams and other bodies of water.

With respect to drift, plaintiffs argue that B.t.k. is known to drift, and that some B.t.k. will reach additional streams via the drift.

Plaintiffs do not dispute that federal and state regulatory agencies have historically not applied the CWA's permit requirements to the release of pesticides into U.S. waters via atmospheric spraying. However, they argue that the plain language of the CWA's definition of "point source" demonstrates that defendants' unpermitted discharge of B.t.k. and TM–BioControl violates Section 301(a) of the CWA.

The CWA defines "point source" as:

any *discernible, confined and discrete conveyance,* including but not limited to any pipe, ditch, channel, tunnel, *conduit,* well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged. This term does not include agricultural stormwater discharges and return flows from irrigated agriculture.

33 U.S.C. § 1362(14) (emphasis added).

According to plaintiffs, the pesticide sprayers mounted on the helicopters result in a "discernable, confined and discrete conveyance," and are also consistent with the term "conduit." Release from this point source results in the insecticide being deposited directly upon or drifting into streams adjacent to the stands of trees.

Plaintiffs also argue that the plain language of the definition of point source must be given effect over any agency regulation that attempts to or could be interpreted as varying the plain meaning. The Environmental Protection Agency (EPA) has promulgated a regulation dealing with silvicultural activities, identifying those that are to be considered point sources subject to NPDES permit requirements and those that are nonpoint sources. (Silviculture activities are those relating to the establishment, development, reproduction, or care of forest trees). The regulation provides as follows:

[40 C.F.R.] § 122.27 Silvicultural Activities (applicable to State NPDES programs, see § 123.25).

(a) *Permit requirement.* Silvicultural point sources, as defined in this section, are point sources subject to the NPDES permit program.

(b) *Definitions.* (1) *Silvicultural point source* means any discernible, confined and discrete conveyance related to rock crushing, gravel washing, log sorting, or log storage facilities which are operated in connection with silvicultural activities and from which pollutants are discharged into waters of the United States. *The term does not include nonpoint source silvicultural activities such as* nursery operations, site preparation, reforestate and subsequent cultural treatment, thinning, prescribed burning, *pest and fire control,* harvesting operations, surface drainage, or road construction and maintenance from which there is natural runoff. However, some of these activities (such as stream crossing for roads) may involve point source discharges of dredged or fill material which may require a CWA section 404 permit (see 33 C.F.R. 209.120 and part 233).

40 C.F.R. § 122.27 (emphasis added).

Plaintiffs argue that this regulation does not purport to rigidly define all silvicultural activities that are point sources. Plaintiffs conclude that the EPA regulation does not, nor was it intended to, exempt a discharge that otherwise meets the detailed statutory definition of a point source.

Thus, plaintiffs urge this court to apply the plain meaning of the statutory definition of "point source," without regard to the EPA's regulation, and hold the discharge of the insecticides in this case is from a point source, which violates the

CWA because defendants have not obtained an NPDES permit.

### 3. *Defendants' Arguments.*

Defendants note that the EIS does not say that spraying discharges pesticides directly into water; rather, it says that application along streams could result in some spray deposited directly into the water. EIS/AR 5099 at IV–15. The target is never the water; it is the trees that may be host to the DFTM.

With respect to the EPA's silviculture regulation, defendants argue that pest control is the activity at issue here; it is expressly a non-point source under the EPA regulation; and the helicopter sprayers are engaged in the normal silvicultural practice of pest control that comes squarely within the definition of "non-point source silvicultural activities" in the EPA regulation. Thus, defendants conclude, there is no discharge from a point source under the CWA.

### 4. *Discussion.*

Courts that have addressed the exclusion from the NPDES permitting requirements for silvicultural nonpoint sources under the CWA and the EPA's regulations, have enforced the regulation's distinction between point and nonpoint sources, recognizing that not all sources of water pollution are point sources subject to NPDES requirements:

> We recognize that nonpoint sources of pollution constitute a major source of pollution in the nation's waters.... When Congress established the [NPDES] in 1976 ..., it drew a distinct line between point and nonpoint pollution sources. Point sources are subject to direct federal regulation and enforcement under the [NPDES]. Nonpoint sources, because of their very nature, are not regulated under the NPDES. Instead, Congress addressed nonpoint

sources of pollution in a separate portion of the Act which encourages states to develop areawide waste treatment management plans.

*Oregon Natural Resources Council v. U.S. Forest Service,* 834 F.2d 842, 849 (9th Cir. 1987) (footnotes omitted).

In *Newton County Wildlife Ass'n v. Rogers,* 141 F.3d 803 (8th Cir.1998), the plaintiffs argued that the USFS had failed to obtain the necessary NPDES permit for discharges of pollutants that accompany logging and road construction. The court found the contentions to be without merit, noting that EPA regulation § 122.27 does not include logging and road building activities in the narrow list of silvicultural activites that are point sources requiring NPDES permits. 141 F.3d at 810. Thus, these activities were nonpoint source silviculture activities. *Id.*

Also in *Sierra Club v. Martin,* 71 F.Supp.2d 1268 (N.D.Ga.1996), defendants did not dispute that their actions would result in pollutants being discharged into various waterways. Rather, defendants argued that the discharge was not from a point source as defined in the CWA and the EPA silviculture regulation. The court noted that "the legislative history and implementing regulations of the Clean Water Act show that Congress and the Environmental Protection Agency intended to exempt most silvicultural activities from the Clean Water Act's permit requirements." 71 F.Supp.2d at 1305. The court went on to hold that because none of defendant's discharges related to rock crushing, gravel washing, log sorting, or log storage facilities (activities designated by the regulation to be point source silvicultural activities), they were nonpoint source silviculture activities and the NPDES permit was not required. *Id.*

Plaintiffs have cited no cases wherein courts have not deferred to the EPA's

interpretation of the statutory term "point source," nor any cases holding that the EPA's silviculture regulation is unenforceable or inconsistent with the plain meaning of the statute.

The silviculture regulation expressly provides that the term "silviculture point source" does not include "non-point source silvicultural activities such as ... pest and fire control." The spraying at issue here is a silvicultural activity, a pest control activity, and included in the list of activities that do not constitute nonpoint source silvicultural activities. Plaintiffs' motion for summary judgment on this claim is denied and defendants' motion for summary judgment is granted.

### D. *Violation of NEPA.*

#### 1. *Introduction.*

Plaintiffs and defendants cross-move for summary judgment on the issue of whether the EIS violates NEPA. Plaintiffs argue, and defendants dispute, that the EIS violates NEPA in each of the following ways, discussed in detail below:

(a) Failing to adequately disclose the impacts on butterflies and other non-target species;

(b) Failing to adequately disclose the impacts on birds;

(c) Failing to adequately disclose the impacts on sensitive bat species;

(d) Failing to adequately disclose the impacts on aquatic species;

(e) Failing to adequately disclose the impacts on insects other than butterflies and moths that prey on pest species of insects;

(f) Failing to adequately disclose potential human health effects;

(g) Failing to adequately address the cumulative effects of the spray project;

(h) Failing to adequately document the true scale of the DFTM outbreak and the ensuing harm;

(i) Ignoring the beneficial role of the DFTM;

(j) Failing to adequately discuss the risk of compromising the DFTM's strongest natural predator (the DFTM virus); and

(k) Failing to adequately disclose site-specific impacts.

#### 2. *Legal Standards for EIS Review Under NEPA.*

The purpose of NEPA is to ensure that federal agencies are fully aware of the impact of their decisions on the environment. *Oregon Environmental Council v. Kunzman,* 817 F.2d at 492. Section 102(2)(c) of NEPA requires federal agencies to prepare an EIS on the environmental impact of any proposed significant federal project, whether those impacts are "direct" or "indirect." 40 C.F.R. § 1502.16; *Id.; City of Davis v. Coleman,* 521 F.2d 661, 676 (9th Cir.1975). The EIS serves two purposes: (a) it ensures that the federal agencies have sufficiently detailed information to decide whether to proceed with an action in light of potential environmental consequences; and (b) it provides the public with information on the environmental impact of a proposed action and encourages public participation in the development of that information. *Kunzman,* 817 F.2d at 492; *Citizens for a Better Henderson v. Hodel,* 768 F.2d 1051, 1056 (9th Cir.1985). The EIS acts as a procedural safeguard that forces the agency to consider a project's effects on the environment. The court's task is to determine if the agency has taken a hard look at the environmental effects. *City of Los Angeles v. F.A.A.,* 138 F.3d 806, 807 (9th Cir.1998).

Under the Administrative Procedures Act, a reviewing court must determine whether the agency action was undertaken observance of procedure required

by law. 5 U.S.C. § 706(2)(A); *Oregon Environmental Council v. Kunzman,* 817 F.2d at 492. The adequacy of an EIS depends upon whether it was prepared in observance of the procedures required by NEPA, and whether it contains a reasonably thorough discussion of the significant aspects of the probable environmental consequences. *Kunzman* at 492. The reviewing court must make a pragmatic judgment whether the EIS's form, content and preparation foster both informed decisionmaking and informed public participation. *Id.* The reviewing court may not "fly speck" an EIS and hold it insufficient on the basis of inconsequential, technical deficiencies. *Id.* However, an EIS may be found inadequate under NEPA if it does not reasonably set forth sufficient information to enable the decisionmaker to consider the environmental factors and make a reasoned decision. *Id.*

A reviewing court may not substitute its judgment for that of the agency concerning the wisdom or prudence of a proposed action. *Kunzman* at 494; *State of California v. Block,* 690 F.2d 753, 761 (9th Cir.1982). NEPA also does not require the reviewing court to decide whether an EIS is based on the best scientific methodology available, nor does NEPA require the court to resolve disagreements among various scientists as to methodology. *Kunzman* at 496. The reviewing court's task is simply to ensure that the procedures followed by the agency resulted in a reasoned analysis of the evidence before it, and that the agency made the evidence available to all concerned. *Id.*

Thus, in the Ninth Circuit, "the environmental impact statement review standard is limited and decidedly deferential to the agency's expertise." *Salmon River Concerned Citizens v. Robertson,* 32 F.3d 1346, 1356 (9th Cir.1994). Further, where the court's review involves the interpretation of an agency's regulation, "we defer to the agency's interpretation unless it is plainly erroneous or inconsistent with the regulation." *Id.*

### 3. *Impacts on Butterflies and Other Non Target Species.*

### (a) *Plaintiffs' Arguments.*

Plaintiffs argue that the administrative record clearly establishes that B.t.k. is a pesticide that is harmful to all butterflies and other Lepidoptera; that exposure to B.t.k. will kill most species of moths and butterflies if the exposure occurs during their larval stage; and that species of butterflies and moths within the target spray areas would be significantly and adversely affected by the aerial application of B.t.k. Plaintiffs argue that the EIS does not adequately disclose these potentially significant effects of the spray project on butterflies and other non-target Lepidoptera, and on the species that they pollinate, both from direct application of B.t.k. and drift from the aerial application.

Plaintiffs cite to the comments of the Washington Department of Fish and Wildlife on the DEIS, wherein the department explicitly requested that the issue of drift of the pesticides be addressed in the EIS. According to plaintiffs, B.t.k. can drift a substantial distance from a target spray area in concentrations that are lethal to butterflies and moths. Plaintiffs argue that the EIS violates NEPA by not addressing the effects of the drift, and also by not assessing the size of the area that would be affected by B.t.k. drift or the actual impact to this area.

Plaintiff cite to comments by both the US/FWS and the U.S. Department of Interior that the impacts to wildlife from this project are likely to be significant. AR 3835; AR 4248. Plaintiffs argue that the EIS downplays these impacts and violates the NEPA by failing to (1) contain any

discussion of the location of sensitive, threatened, and endangered species, and what site-specific impacts to those species will be; or (2) mention surveying for sensitive species to locate them and protect them from spraying, as recommended by the US/FWS. Rather, according to plaintiffs, the EIS vaguely states that the spraying process "may" be modified or mitigated in some unstated ways to protect sensitive wildlife. EIS/AR 5099 at App. G–3.

Plaintiffs also cite to US/FWS comments on the DEIS that sensitive butterflies, including the Mardon skipper, a candidate species for listing under the Endangered Species Act, are at particular risk from the use of B.t.k., and that showy stickseed is at risk from spraying because it is known to be pollinated in part by Lepidopterans. The showy stickseed was recently proposed a candidate for listing under the Endangered Species Act. AR 3839, 3842.

Lastly, plaintiffs contend that the EIS' assertion that populations of non-target Lepidoptera would recover to pre-spraying levels within one to two years is conclusory and not supported by data. EIS/AR 5099 at IV–43.

### (b) *Defendants' Arguments.*

Defendants argue that the EIS adequately discloses the impacts to non-target Lepidoptera (moths and butterflies), and the plant species they pollinate, and that it does not downplay the impact of B.t.k. on non-target Lepidoptera. For example, the EIS expressly states that "B.t.k. does affect many Lepidoptera species—(moths and butterflies). Given its broad range of efficacy, there can be little question that native species would be affected in a protected area." EIS/AR 5099 at IV–42. The EIS also notes that "applications of B.t.k. have been demonstrated to cause a significant decrease in the number of larval and adult Lepidoptera the year of protections

[ten citations omitted]. Impacts include a significant decrease in the richness and/or abundance during the year of protection." EIS/AR 5099 at IV–42, IV–43. These statements, contained in the EIS section on impacts on non-target Lepidoptera in Chapter IV and including citations to twelve different studies, contradict plaintiffs' allegation that impacts to Lepidoptera were not properly considered or disclosed.

It is defendants' position with respect to this issue, and to several other issues raised by plaintiffs and discussed below, that plaintiffs' arguments have inappropriately relied on comments made on the DEIS. Defendants acknowledge that they are legally obligated to assess and consider comments on the DEIS, both individually and collectively, and respond to those comments. 40 C.F.R. § 1503.4(a). Under the regulation, possible responses include modifying alternatives; developing and evaluating other alternatives; supplementing, improving or modifying analyses; making factual corrections; or explaining why no further response is needed. *Id.* Defendant argue that they properly addressed comments made on the DEIS, and that plaintiffs' attack on the DEIS, without consideration of the responses to comments in the EIS and ROD, is misplaced and fails to support their position. Defendants refer to Appendix C of the EIS, which summarizes responses to public comments on the DEIS, and to pages I–1, II–1, III–2, and IV–4 of the EIS, which summarize changes made to the EIS in response to public comments.

Defendants also contend that plaintiffs' arguments are contradictory. Plaintiffs argue that the EIS "downplays" impacts to wildlife, while citing to pages IV–15 through IV–37 of the EIS. These are 17 pages of the EIS devoted to a discussion of the impacts to wildlife. In addition to the

discussions in the EIS, defendants point to numerous specialist reports on the impacts to other wildlife that were relied upon and are contained in the administrative record, including reports on anadromous fish, bull trout, other fish and wildlife (including Management Indicator Species, proposed sensitive species, and species with identified concerns such as flammulated owls, goshawks, barred owls, cutthroat, other resident trout, margin sculpin, songbirds, bats, shrews, deer and elk), and species listed under the Endangered Species Act. *See,* Def. Memo., p. 43, for citations to these studies. Defendants also argue that the administrative record supports the conclusion in the EIS that the project has no effect on the Canada lynx, woodland caribou, or bald eagle in four forests, or on the Lost River, shortnose, and Warner suckers, and that the project is not likely to adversely affect the gray wolf, grizzly bear or bull trout on four forests, or the bald eagle on one forest. AR 5348–54. Defendants contend that the US/FWS concurred in these conclusions.

Defendants argue that the EIS also discloses that, for all sensitive fish and wildlife species except the big-eared bat, the project has effects that are immeasurable, minor, or consistent with conservation strategies. EIS/AR 5099 at IV–32 to IV–35. As to the big-eared bat, limiting spraying in bat areas to TM–BioControl minimizes the impact on the bat species because TM–BioControl does not affect flying insects (the bats' food source) other than tussock moths and is not subject to the same drift issues as B.t.k. EIS/AR 5099 at IV–35; ROD/AR 5533 at 4.

With regard to the showy stickseed, both the EIS and the second ROD took note of the showy stickseed, a plant found only on the Leavenworth Ranger District, and established a specific mitigation measure applicable to all the action alternatives: only TM–BioControl could be used in a buffer around showy stickseed because these "plants are pollinated by Lepidoptera (moths and butterflies)." EIS/AR 5099 at II–7; ROD2/AR 5719 at 4. The EIS also analyzed the Mardon skipper as a non-target Lepidoptera species of concern because it is a candidate for federal listing. EIS/AR 5099 at III–26, IV–42, IV–43.

### (c) *Discussion.*

My review of the EIS indicates that it discloses and discusses the negative effects to non-target species in numerous places, and in fact the ROD adopts mitigation measures to lessen the impacts of the negative effects. For example:

■ (1) The EIS and ROD analyze the effects of direct applications of both B.t.k. and TM–BioControl. EIS/AR 5099 at II–7, IV–43, App. C–9, App. G–2; ROD/AR 5533 at 4. The EIS contains a 65 page chapter that analyzes the effects of each of the three alternatives on threatened and endangered species in each of the affected national forests, and on the DFTM and non-target moths and butterflies. EIS/AR 5099 at Chapter IV. As to the effects of each alternative on the 40 sensitive species that were analyzed in the EIS, for most the determination was either "no effect" or "may affect, but will not lead towards federal listing." EIS/AR 5099 at IV–27 to IV–37.

(2) The whole of Appendix E is devoted to the effects of B.t.k. on non-target moths and butterflies. EIS/AR 5099 at App. E. B.t.k. affects many Lepidoptera species (moths and butterflies) and there is little question that native species would be affected in sprayed areas. EIS/AR 5099 at IV–42. B.t.k. will cause a temporary reduction in populations of non-target Lepidoptera in treatment areas. EIS/AR 5099 at IV 61; ROD/AR 5533 at 6. These effects will be minimized through a mosaic of untreated areas and areas treated with

only TM–BioControl. *Id.* Other mitigating and operational measures will include avoiding meadows and forest edges where the highest number of non-target Lepidoptera are likely to occur. *Id.* Further, "[a] number of recent studies on non-target Lepidoptera show that these insects return to pre-treatment levels" in two to three years. EIS/AR 5099 at IV–61.

(3) TM–BioControl does not affect non-target moths and butterflies because it is specific to DFTM. EIS/AR 5099 at IV 43. The decision to use TM–BioControl to the largest extent possible was designed to address the concern about the impact of the project on non-target moths and butterflies: TM–BioControl targets DFTM, and its use will therefore reduce any potential effect on non-target moths and butterflies. ROD/AR 5533 at 6. In addition, about 40 percent of the supplies of TM–BioControl will be reserved for use in areas where mitigation measures are being employed, including, fish habitats, big-eared bat maternity sites, spotted owl activity centers, and songbird study areas. *Id.*

(4) Any effects from drift would be similar to or less than the effects of direct application. ROD/AR 5533 at App., p. 5 (unnumbered pages). Drift cannot be avoided, but operational guidelines will mitigate impacts from drift. *Id.* Operational guidelines include suspension of spraying when weather conditions could cause drift into non-spray areas and observation aircrafts with qualified aerial observers accompanying the spraying aircraft to monitor spray behavior and assist in avoidance of sensitive areas. EIS/AR 5099 at App. G 1.

(5) In treatment areas, wildlife will not be able to take advantage of high DFTM populations for opportunistic feeding, but DFTM in adjacent unprotected areas will be available for such feeding. *Id.*

(6) The Mardon skipper was analyzed as a non-target Lepidoptera species of concern because it is a candidate for federal listing. EIS/AR 55099 at III–26, IV–42, IV–43. The Mardon skipper does not occur in analysis areas of Washington and, in Oregon, is found only in Klamath County, which is not included in the spray project. EIS/AR 5099 at IV–42; ROD/AR 5533 at 6.

The EIS also summarizes the public comments the agency received, and summarizes its responses to those comments. EIS/AR 5099 at App. C. Plaintiffs' reliance in its arguments, with respect to this issue and the others discussed below, on comments made prior to publication of the EIS is not well taken. Defendants correctly point out that their legal obligation is to consider comments and respond to them, but not to modify the project to conform with each and every comment. The project obviously evokes competing opinions and concerns, and the agency has the discretion to decide among the alternative courses of action.

■■■ This court's review of an EIS under NEPA is very limited. The court must determine if the EIS contains a reasonably thorough discussion of the significant aspects of the environmental impact, and may not substitute its own judgment for that of the agency. *Oregon Environmental Council v. Kunzman,* 817 F.2d at 492, 494. Rather, the court must simply ensure that the procedures followed by the agency resulted in a reasoned analysis and the agency made that evidence available to all concerned. *Id.*

Applying these standards to plaintiffs' arguments on this issue, I conclude that the EIS provides at least a reasonably thorough discussion of the issue, and also documents consideration of and responses to public comments. Plaintiffs' challenge on this issue is without merit.

#### 4. *Impacts on Birds.*

##### (a) *Plaintiffs' Arguments.*

Plaintiffs argue that the EIS inadequately discloses the impacts on bald eagles and other bird species from (1) reduction of insect food sources; (2) direct toxicity of the sprays; (3) use of helicopters for spraying; and (4) overstocking, leading to reduced suitable habitat.

With respect to reduction in food sources, plaintiffs argue that the EIS only briefly discusses the issue of reducing insects as food sources for birds, without disclosing the full potential impacts of the reduction. Plaintiffs argue that the following "whitewashed" conclusion in the EIS violates the NEPA: "Because Lepidoptera comprise only a small portion of the diets of these species and [spraying] would not be uniform across the landscape, there should not be impacts to the species that would result in a trend toward Federal listing or a loss of viability." EIS/AR 5099 at IV–33 to IV–34.

Plaintiffs argue that B.t.k. can be directly toxic to birds, and that concerns also exist about impacts to nest sites of both spotted owls and bald eagles. Plaintiffs argue that the EIS contains no discussion of the impacts to nesting areas from helicopters, even while acknowledging that helicopters will fly 50 to 75 feet above the tops of trees. EIS/AR 5099 at G–2. Further, the EIS admits, under the No Action alternative, that "[d]efoliation in stands used for breeding could benefit habitat" of bald eagles. EIS/AR 5099 at IV–16. The EIS states that "[p]roposed treatment areas could perpetuate 'over-stocked' stands that could reduce the vigor of potential nest trees" for bald eagles. EIS/AR 5099 at IV–20.

Thus, plaintiffs' argument is that the EIS violates NEPA because, despite the beneficial impacts to bald eagles from the No Action alternative and the harmful impacts from helicopters and spraying, the EIS makes the unsupported conclusory and ambiguous statement that "there could be both negative and positive effects on bald eagle habitat under the Proposed Action." EIS/AR 5099 at IV–20.

##### (b) *Defendants' Arguments.*

With respect to bald eagles, defendants argue that, under the ROD, active bald eagle nests are excluded from treatment by a½ to 1 mile buffer around, and a vertical buffer of 1000 feet, except for one isolated habitat site on the Umatilla National Forest. ROD2/AR 5719 at 4. The particular site on the Umatilla National Forest that may be sprayed was the subject of consultation with the US/FWS because this species is listed under the Endangered Species Act, and the biological opinion of the US/FWS is that the DFTM project, as proposed, is not likely to jeopardize the continued existence of the bald eagle.

With respect to the spotted owl, defendants argue that the biological opinion of the US/FWS is that the DFTM project has a beneficial effect on northern spotted owls by maintaining and preserving habitat and nest sites, and that the DFTM project is not likely to jeopardize the continued existence of the spotted owl. AR 5667–93; ROD2/AR 5719 at App., p. 8.

With respect to insects as food sources for birds, defendants argue that the EIS is not conclusory or "whitewashing" on the issue. Rather, the conclusions in the EIS are justified because: (a) the only areas that will be sprayed are the Areas of Concern where the DFTM reaches certain populations levels; and (b) only TM Bio-Control will be used in forested areas where non-target Lepidoptera provide a critical food supply for other wildlife. EIS/AR 5099 at IV–33. These areas include streams, spotted owl nest sites, important wildlife habitat areas, and areas

that may harbor unusual Lepidopteran species.

The EIS also recognizes that defoliation in areas that are not treated in this project (untreated areas constitute 88 percent of the potential affected host stands on national forest lands) could create large forest openings where shrubs and grasses would provide increased habitat for moths and butterflies. EIS/AR 5099 at IV–43. Thus, defendants argue, it is clear that not only did defendants recognize the importance of moths and butterflies as food sources, but they also included specific mitigation measures to ensure that such food sources were not unnecessarily diminished.

Defendants also dispute plaintiffs' assertion that the EIS contains no discussion of the impacts to nesting areas from helicopters, citing to discussions of disturbance to spotted owls from aircraft on the Okanogan, Wenatchee, and Winema National Forests. EIS/AR 5099 at IV–21 and IV–23. As to bald eagles, nest sites within the project area are not "proposed for protection because the potential for disturbance to the fledglings with application of the pesticides would be more detrimental than the defoliation and subsequent mortality itself." EIS/AR 5099 at IV–20. In other words, defoliation is expected to be beneficial for bald eagle habitat and, therefore, bald eagle areas are not included in areas to be treated, with the exception of one nest in host type forest in the Umatilla National Forest. *Id.* As to this one location, 50 acres of the 125 acres core nesting habitat are in host type. EIS/AR 5099 at IV–22. Possible disturbance to nesting eagles in this location is acknowledged, but the EIS notes that past observations of this particular nest have shown that the juvenile eagles would probably have already fledged from the nest by the time of year that spraying occurs. The extent of the impact would be that project aircraft could startle birds from the nest. AR 5667–93.

**(c)** *Discussion.*

■■■ Plaintiffs argue the EIS contains inadequate disclosures regarding negative impacts to birds, and no disclosures at all regarding impacts to nesting. However, my review of the EIS indicates that there are a number of references indicating consideration of both subjects. For example:

(1) There could be significant disturbance effects to bald eagles and, in most cases, defoliation would either slightly negatively affect (reduction of canopy closure and loss of structure in some stands) or slightly positively affect (thinning out of stands, thus prolonging life and health of habitat) bald eagle nesting habitat. EIS/AR at IV–19 to IV–20. Bald eagles are also discussed in the EIS at EIS/AR 5099 at II–7.

(2) Except for the bald eagle nest in the Umatilla National Forest, a½ to 1 mile no-treatment buffer is placed around all bald eagle nests, with helicopters staying outside the no disturbance zone so as to not disrupt nesting. EIS/AR at II–7, IV–20.

(3) Peregrine falcons could be affected by disturbance from the helicopters, but the 1 mile buffer around active Peregrine falcon nests results in a finding of "no effect" on these birds. ROD/AR 5533 at 7.

(4) Flammulated owls feed mostly on Lepidoptera. The No Action alternative would result in a temporary increase in DFTM (a positive effect), but would also result in loss of habitat from defoliation (a negative effect). *Id.* The project will result in temporary reductions of Lepidoptera, but will still allow these owls to take advantage of high DFTM populations in adjacent untreated areas. *Id.*

(5) Numerous discussions of the spotted owl are in the EIS and administrative

record. *See, e.g.,* EIS/AR 5099 at III–22 and IV–17 to IV–26.

Thus, applying the Ninth Circuit's review standard for environmental impact statements, I conclude that the EIS adequately discloses and contains a reasonably thorough discussion of the potential negative impacts to sensitive species of birds, their food sources, and their nesting habitats, and the ROD adopts mitigation measures such as no-spray buffers and use of TM–BioControl only in certain areas in order to lessen those impacts. I may not substitute my judgment for that of the USFS as to the proper evaluation of this information or the conclusions reached. *Oregon Environmental Council v. Kunzman,* 817 F.2d at 492. Therefore, plaintiffs' challenge on this issue is without merit.

### 5. *Impacts on Sensitive Bat Species.*

#### (a) *Plaintiffs' Arguments.*

Plaintiffs cite to a US/FWS comment on the DEIS that a decrease in the abundance of moths may affect bats, especially the sensitive Townsend's big-eared bat, with potentially "dramatic local effects." AR 3840. Plaintiffs argue that the EIS violates NEPA by not adequately addressing this comment and the impact to bats.

#### (b) *Defendants' Arguments.*

Defendants point out that, in response to concerns about food sources for bat species, the ROD establishes a 1.75 mile radius around known or potential Townsend's big-eared bat maternity sites in which only TM–BioControl may be used. The EIS acknowledges the Townsend's big-eared bats, like many bats, feed mostly on flying insects; therefore, where Townsend's big-eared bat maternity sites are found within Areas of Concern that qualify for treatment, the mitigation measure is designed to only impact DFTM, not other moths and butterflies that serve as a food

source. EIS/AR 5099 at IV–35. Thus, defendants argue that the EIS adequately addressed the US/FWS comment cited by plaintiffs.

#### (c) *Discussion.*

██ The EIS does disclose that treatment with B.t.k. could impact the Townsend's big-eared bat because non-target Lepidoptera are their primary food source, but also indicates that treatment with TM–BioControl would have minimal impact because it would affect only DFTM. ROD/AR 5533 at 7. The EIS goes on to provide that the effects of the project on bats will be minimized by use of TM–BioControl only within a 1.75 mile buffer around known or potential nurse colonies. EIS/AR 5099 at II–7.

Given the limited review under NEPA, I conclude that the EIS and the ROD adequately discuss and address the comments by the US/FWS, and the concern about food sources for bat species. In fact, a specific mitigation measure was designed to address this very concern. Plaintiffs' arguments on this issue are without merit.

### 6. *Impacts on Aquatic Species.*

#### (a) *Plaintiffs' Arguments.*

Plaintiffs argue that, because the spray will enter waterways directly or via drift, it is likely to impact aquatic species. AR 1573–74. Plaintiffs' position is that the EIS violates NEPA by not disclosing the potential concentrations of B.t.k. that might end up in waterways through direct application or drift, especially given that defendants admit that up to 942 miles of streams could be sprayed. EIS/AR at IV 57.

#### (b) *Defendants' Arguments.*

Defendants note that direct application to open bodies of water is to be avoided

whenever operationally feasible. EIS/AR 5099 at App. C–10. However, since one of the objectives of the project is to protect host trees that are critical in maintaining the riparian condition or habitat, meeting this objective may require treatment adjacent to and over some streams. *Id.* Defendants point out that the effects of both TM–BioControl and B.t.k. on water quality are discussed in the EIS, and that the conclusion is that neither insecticide will affect water quality. EIS/AR 5099 at IV–15.

Defendants also argue that the National Marine Fisheries Service agreed with the USFS' conclusion that the project would have no adverse effect on listed anadromous fish species (steelhead trout, chinook and sockeye salmon). AR 5497–5509; ROD/AR 5533 at 9.

### (c) *Discussion.*

■ The EIS does not ignore the fact that some pesticide will be deposited or drift onto waterways, and it does discuss the impact of the project on aquatic species. For example, the EIS provides that:

(1) The project will preserve the habitat for threatened and endangered aquatic species including anadromous fish (salmon and steelhead) and bull trout, and the No Action alternative would result in adverse impacts through loss of habitat. EIS/AR 5099 at IV–24; ROD/AR 5533 at 6.

(2) There is no direct effect to threatened and endangered aquatic species from either B.t.k. or TM–BioControl or their inert ingredients, and no indirect effect on food sources. *Id.*

(3) There could be mortality of aquatic insects associated with using B.t.k., which could reduce salmon food supplies. EIS/AR 5099 at IV–34, IV–35.

(4) At the rate that B.t.k. would be applied, "[a]ny amount reaching water would be diluted and reduced significantly. The concentrations that would reach the water

through aerial application would not affect water quality." EIS/AR 5099 at IV–15.

(5) With respect to TM–BioControl, although the DFTM virus could survive in water, it is species-specific and would not affect water quality, and the small amounts that might reach water would be diluted quickly in running streams. *Id.* The EIS cites three studies in support of these conclusions. *Id.*

(6) The EPA reports that the risks to non-target freshwater fish and freshwater aquatic species are minimal to non-existent with the application of B.t.k. at the label use rates of registered B.t.k. EIS/AR 5099 at IV–56.

■ This court cannot decide whether an EIS is based on the best scientific methodology available, nor can the court to resolve disagreements among various scientists as to methodology. *Oregon Environmental Council v. Kunzman* at 496. The EIS evidences an evaluation of the issues of effect on aquatic species and water quality, with reliance on scientific studies. The EIS does not discuss drift in as great of detail as plaintiffs would like, or attempt to ascertain the concentrations of B.t.k. that could result from drift, because of the conclusions in the EIS that at the rate that B.t.k. would be applied, any amount reaching water would be diluted and reduced significantly, and the concentrations that would reach the water through aerial application would not affect water quality. It is within the discretion of the USFS to come to this conclusion based upon its investigation and research, and this court may not substitute its judgment for that of the USFS.

I conclude that the process and procedures followed by the USFS in its consideration of the effects on aquatic species resulted in a reasoned analysis of the evidence before it, and that the USFS made the evidence available to all concerned.

Thus, plaintiffs' challenge on this issue is without merit.

### 7. *Impacts on Insects Other Than Butterflies and Moths That Prey on Pest Species of Insects.*

#### (a) *Plaintiffs' Arguments.*

Plaintiffs argue that the EIS violates the NEPA by not evaluating and disclosing the potential harm to insects, other than butterflies and moths, that feed or prey on pest species of insects. According to plaintiffs, the EPA has never studied the effects of B.t.k. on non-target insects. AR 399A. Plaintiffs cite to a comment by the US/FWS that the EIS "summarized that B.t.k. or TM–BioControl would 'not harm' Hempteran, Coleopteran, and Tricopteran species. The Re-registration Eligibility Decision (EPA 1998) states that depending on the strain of B.t.k. used, as many as 20 percent of [such] species may be affected." AR 3839.

#### (b) *Defendants' Arguments.*

Defendants argue that, again, plaintiffs' citations to the administrative record on this issue evidences that defendants did in fact consider the effects of spraying on other insects. In addition, defendants again argue that plaintiffs are improperly relying on comments the US/FWS made to the DEIS, to which the EIS responded.

Defendants argue that the EIS relied upon the analysis in, and specifically incorporates by reference, the 1995 Programmatic Gypsy Moth Environmental Impact Statement (Gypsy Moth EIS), which discussed the effects of spraying on other insects.

#### (c) *Discussion.*

■ I could find no references to the specific category of "insects that prey on other pest insects" in the EIS. The EIS does incorporate the Gypsy Moth EIS which defendants argue contains discussions on the effects of spraying on insects other than moths and butterflies.

Even if this specific category of discussion is missing from the EIS, or poorly covered by the EIS, I note that a reviewing court must make a pragmatic judgment whether the EIS' form, content and preparation foster both informed decision-making and informed public participation; however, the court may not "fly speck" an EIS and hold it insufficient on the basis of inconsequential, technical deficiencies. *Oregon Environmental Council v. Kunzman*, 817 F.2d at 492. I conclude that any failure to discuss the specific category of "insects that prey on other pest insects," in light of other discussion of impacts on insects, is an inconsequential deficiency in the EIS.

### 8. *Potential Human Health Effects.*

#### (a) *Plaintiffs' Arguments.*

Plaintiffs argue that the EIS minimizes the possibility that "aerially spraying hundreds of thousands of acres with either B.t.k. or TM–BioControl could have any measurable impact on human health, calling the acknowledged eye, skin, and respiratory tract irritation they cause 'little cause for concern'." Pl. Memo., p. 35; EIS/AR 5099 at App. H–4.

According to plaintiffs, the impacts of both the spray formulations are highly controversial and unknown, and the conclusory analysis in the EIS of this issue violates the NEPA. Although the EIS acknowledges that the spraying may cause human eye, skin, and respiratory tract irritation, plaintiffs take exception to the conclusion in the EIS that this is little cause for concern and that "the likely-hood [sic] of such effects cannot be assessed because of limitations in the availability of toxicity and exposure data." EIS/AR 5099 at App. H–4 & H–9.

Plaintiffs argue that the EIS does not engage in the analysis required by NEPA and 40 C.F.R. § 1502.22(b) when impacts are uncertain, and that the analysis is absent despite the fact that the EIS acknowledges many uncertainties regarding the pesticides. Those uncertainties include the complex nature of the formulations and the fact that the agent causing B.t.k. irritation has not been clearly identified (EIS/AR 5099 at H–6); that many of the components of TM–BioControl are complex and not chemically defined (EIS/AR 5099 at App. H–7); and that B.t.k. and TM–BioControl are not applied in pure form, and over 80 percent of the solution is proprietary insecticidal additives (referred to as "inerts") that are used as sticking agents, sunscreens, and fungal retardants. EIS/AR 5099 at App. H–5.

Plaintiffs argue that the EIS fails to disclose that the impacts to humans from unknown inert ingredients are potentially quite significant, especially to sensitive individuals, and that the failure to include this available information in the EIS violates NEPA. Plaintiffs argue that the USFS must disclose "all the chemicals [including the inert ingredients] and their potential effects to humans prior to utilizing such chemicals on national forests." Pl. Reply, p. 31.

Plaintiffs also argue that the EIS fails to describe how sensitive individuals, such as those with compromised immune systems or preexisting allergies, will be notified of spraying. These individuals may be particularly susceptible to the effects of B.t.k. (AR 1571), and the EIS improperly leaves it up to each individual forest to design notification procedures. EIS/AR 5099 at App. G–1.

Plaintiffs dispute the EIS' conclusion that presence of TM–BioControl in the soil will cause minimal, and only fleeting, impacts to humans, arguing that this virtually unknown substance could have longer term impacts of which we are currently unaware. Plaintiffs argue that these uncertainties raise issues that are significant and must be addressed in the EIS.

Lastly, plaintiffs argue that "[a]necdotal information [about the sprays] is disturbing," citing to numerous such references in the administrative record. Pl. Memo., pp. 35–36.

### (b) *Defendants' Arguments.*

Defendants argue that rather than downplaying any negative information on potential human health effects, as plaintiffs contend, a review of the EIS establishes that it clearly evaluates and discloses it. The EIS also discloses the adverse human health effects of tussockosis, the allergic reaction to DFTM. EIS/AR 5099 at App. H–3.

The EIS relied upon the analysis in, and specifically incorporates by reference, two in-depth risk assessments that considered the potential adverse human health impacts from exposure to B.t.k. and TM–BioControl. EIS/AR 5099 at IV–49. An in-depth risk assessment was also done for B.t.k. and another pesticide equivalent to TM–BioControl in the Gypsy Moth EIS. *Id.* The Gypsy Moth EIS is also cited in Appendix H of the EIS dealing with the human health effects analysis. EIS/AR 5099 at App. H.

Defendants argue that given (1) the studies done for the Gypsy Moth EIS, incorporated by reference into the EIS and not challenged by plaintiffs; (2) the considerable discussion of studies that were considered and are referenced in Appendix H and the EIS; and (c) that the uncertainties regarding the pesticides are not essential to a reasoned choice among alternatives, the law does not require the defendants to portray information as plaintiffs desire.

Further, defendants argue that the EIS discloses that the effects of human exposure to the DFTM, TM–BioControl or B.t.k. have all been studied and, under routine exposure conditions, adverse health effects are caused primarily by the DFTM. EIS/AR 5099 at IV–49. The EIS also discloses that the adverse effects of the DFTM, TM–BioControl and B.t.k. are not life threatening or debilitating, and are reversible, although some individuals may be at greater risk. EIS/AR 5099 at App. H–9.

With respect to plaintiffs' arguments that the USFS did not engage in the analysis required by § 1502.22(b), defendants argue that such an analysis is required only when the project risks are highly uncertain. Defendants argue that in this case, the project impacts are predictable and disclosed in the EIS. Defendants also argue that plaintiffs "fail utterly to prove what relevant information was essential yet missing, especially given that the decision was to protect from defoliation a maximum of 627,880 acres ... rather than to protect a maximum of 2.5 million acres" of the rejected Expanded Protection alternative. Def. Reply, p. 13.

With respect to notification of sensitive individuals, defendants argue that notifying the public of actual spray dates and locations is properly left to the implementation of the project. They further argue that the NEPA does not require detailed information such as "how sensitive individuals will be notified of spraying," and neither do NEPA regulations require analysis of every single uncertainty.

Regarding anecdotal information, defendants note that this information was contained in a newsletter published by an interest group (Pl. Memo., p. 35, referring to AR 1570), and that their legal mandate is to rely on the expertise in scientific studies conducted by various agencies, citing EIS/AR 5099 at IV–49 to IV–50, References Cited pp. 1–11, App. H.

#### (c) *Discussion.*

 I note the following discussions in the EIS and the ROD relating to the issue of human health effects:

(1) DFTM outbreaks are associated with adverse human health effects called tussockosis, an allergic reaction characterized by skin irritation, eye irritation, and respiratory tract irritation. EIS/AR 5099 at App. H–3. The spray project meets the objective of protecting people from the tussockosis that could result from high populations of DFTM larvae in high-use areas. ROD/AR 5533 at 8. In unprotected areas, visitors and forest workers will be exposed to DFTM larvae, and approximately 25–40 percent of the public and 41–75 percent of workers will experience reactions if they are exposed to outbreak levels of DFTM larvae. *Id.* Individuals who have an allergic reaction to DFTM larvae may also react to the DFTM parts in the TM–BioControl. EIS/AR 5099 at App. H–7.

(2) Risk assessments indicate that exposure to the DFTM, B.t.k., and TM–BioControl all cause the same general types of human health effects: skin, eye, or respiratory tract irritations. These effects are not known to be life-threatening or debilitating, and are reversible. EIS/AR 5099 at IV–49 to IV–51, App. H–9.

(3) Timely notification will be given to anyone who may be near a project area during spraying. EIS/AR 5099 at App. G. Spray areas will be signed and posted with warning and explanations of what is occurring. ROD/AR 5533 at 8.

(4) It is possible some people will be exposed to spray, especially in and around high-use areas such as campgrounds and administrative sites. *Id.* The only group

likely to be subject to successive years of exposure to spray are workers who work on successive projects in different areas. EIS/AR at IV–50.

(5) B.t.k. formulas are complex and may have toxic properties that are unrelated to the presence of B.t.k. EIS/AR 5099 at IV–49. The EPA and its Canadian equivalent have concluded that B.t.k. is not a human pathogen. EIS/AR 5099 at IV–49 to IV–50. There are inert ingredients in B.t.k. products, but the information about them is proprietary. EIS/AR 5099 at IV–49 to IV–50, IV–56, App. C–10, App. H–5. It is unclear if effects on humans are caused by B.t.k. or the inert ingredients. EIS/AR 5099 at IV–49. The inert ingredients are listed by the EPA as generally recognized as safe or as having insufficient information to classify. *Id.* Defendants used EPA and Canadian information, in addition to field studies, lab reports, and other existing information from the Gypsy Moth EIS and Canadian reports, in the analysis to determine that inert ingredients would have minimal impact to the environment and human health. *Id.*

(6) For TM–BioControl, the inert ingredients are also proprietary information; however, all inert ingredients are listed by the EPA as generally recognized as safe. EIS/AR 5099 at IV–50, App. C–10, App. H. Most of the components of TM–BioControl are complex natural projects. EIS/AR 5099 at IV–50. The EPA has determined that formal exposure assessments for the public and workers are not required because of the lack of any apparent systemic toxic effects. *Id.*

(7) B.t.k. and TM–BioControl have been tested experimentally and used operationally for decades. EIS/AR 5099 at IV–39.

■■■ 40 C.F.R. § 1502.22(b) provides that, in evaluating adverse effects on the human environment, where there are gaps in relevant information or scientific data, the agency must make it clear that such information is lacking, or that uncertainty exists. If the information relevant to adverse impacts is essential but not known, the agency must fill that gap by independent research. *Save Our Ecosystems v. Clark,* 747 F.2d 1240, 1249 (9th Cir.1984). An agency need not do independent research if the costs of doing the research are exorbitant or the research means are beyond the state of the art. 40 C.F.R. § 1502.22(b). However, the § 1502.22(b) analysis is required only if the incomplete information is relevant to reasonably foreseeable significant adverse impacts and is essential to a reasonable choice among alternatives. There is ample evidence in the record here that evaluates the potential effects of the insecticides, and supports the conclusion is that there are no significant adverse effects. Plaintiffs have not made a sufficient contrary showing to prevail on this argument.

■■■ Plaintiffs argue that the EIS makes conclusory unsupported statements that minimize the human health effects of the toxic ingredients in B.t.k. and TM–BioControl. My review of the EIS indicates that its conclusions about the potential adverse human health effects are supported by a number of studies and decades of use. The USFS relied upon in-depth risk assessments of B.t.k. and TM–BioControl that analyzed the toxic ingredients in the formulations. It appears there is no gap in this research that requires independent research.

■■■ With respect to inert ingredients, the data gaps for inert ingredients are the result of confidential business information policies and are not disclosable. Further, the EPA concluded that, based upon a review of the chemical structure of the known ingredients and available toxicity data, that most of the inert ingredients did not support a specific toxicological concern. I conclude that defendants have

properly relied on information from the EPA and that there is no gap in the information on inert ingredients that requires independent research. In *Northwest Coalition for Alternatives to Pesticides v. Lyng,* 844 F.2d 588 (9th Cir.1988), the Ninth Circuit approved an environmental impact statement in which not all the ingredients of the proposed formulations were known to the government. The government in that case, as here, reasoned that identified active ingredients, rather than unknown inert ingredients, should be its focus in evaluating herbicide formulations, and the government's analysis cast doubt on the possibility that the herbicide formulations were more toxic than their active ingredients alone. 844 F.2d at 597–98.

In addition, in *Salmon River Concerned Citizens v. Robertson,* the Ninth Circuit accepted the opinion of the USFS' experts that its risk assessment of the active ingredients in the herbicides at issue provided a sound basis for an evaluation of the reasonably foreseeable significant adverse effects on the human environment, despite the absence of chronic toxicity data on some inert ingredients. 32 F.3d at 1358.

NEPA requires the agency to gather sufficiently detailed information to decide whether to proceed with a proposed action, and to disclose that information to the public. In this case, EIS appears to have disclosed and discussed the potential adverse human health effects from the project in a manner that complies with NEPA. The EIS evaluates the possible human health effects of three separate alternatives and relied upon and incorporates by reference in-depth risk assessments done by others on the same or similar pesticides. Further, Appendix H of the EIS discusses human health effects in hazard identification, exposure assessment, exposure-response assessment, risk characterization, cumulative effects, con-

nected action, and group risks for the DFTM outbreak itself, for B.t.k. treatment, and for TM–BioControl treatment.

My review of the EIS also indicates that it discusses the risks to chemically sensitive individuals, and that the discussion appears to be adequate. An EIS need not quantify every risk, particularly less likely risks. *Salmon River Concerned Citizens v. Robertson,* 32 F.3d at 1359.

Plaintiffs' challenge on the issue human health effects is without merit.

### 9. *Cumulative Effects of the Spray Project.*

#### (a) *Plaintiffs' Arguments.*

Plaintiffs argue that the EIS violates NEPA by failing to adequately consider or evaluate the cumulative effects from other past, present and reasonably foreseeable B.t.k. spray projects continuing to occur on USFS lands, as well as on state, tribal and private lands surrounding the project area. According to plaintiffs, the EIS contains vague and conclusory analyses on this issue.

First, plaintiffs argue that the EIS does not discuss how the cumulative effects can reduce the DFTM virus. According to plaintiffs, the DFTM virus requires soil duff and is eliminated by fire, logging, and the type of larvae-stage spraying proposed here. They concede that any one of these events might be insufficient to result in a significant decrease in the DFTM virus population, but they argue that together they may have the potential to do so. And, it is undisputed that a significant reduction in the virus population would be a catastrophic situation because the virus is what causes the periodic DFTM outbreaks to naturally crash.

Second, plaintiffs argue that the EIS does not adequately address the cumula-

tive impacts to humans from the spraying, stating only that "[t]he effects of multiple exposures over several years, however, cannot be directly assessed." EIS/AR 5099 at App. H–6. It is plaintiffs' position that defendants cannot avoid their NEPA responsibilities by cloaking themselves in ignorance.

**(b)** *Defendants' Arguments.*

With respect to fire, logging, and spraying cumulatively reducing the DFTM virus, defendants note that plaintiffs have not identified any fire project or timber sale in any Area of Concern, and that in fact little, if any, logging, is permitted under Forest Plans in the Areas of Concern (including anadromous fish and bull trout habitats, bald eagle habitat, designated old growth and late/old structural stands, residential and administrative sites, high-use recreation sites, municipal watersheds, scenic areas, or seed orchards). Defendants point out that the spraying for DFTM in combination with timber harvest and prescribed burning was an alternative that the USFS expressly rejected for detailed consideration. EIS/AR 5099 at II–7.

Defendants also argue that research does not indicate that the virus is completely eliminated by the type of spray project proposed but, instead, that the virus is returned to the soil layer by the death of the older larvae. EIS/AR 5099 at App. B 2. Defendants argue, as discussed in more detail in Section D12 below, that a careful reading of Appendix B of the EIS explains that smaller larvae bodies remain glued to the foliage, where older larvae encounter the virus. A large amount of the virus is produced in these older larvae which, when they die from virus infection, and then rupture with their liquified body contents (containing the virus) spilling onto the forest floor. EIS/AR 5099 at App. B 2.

With respect to cumulative impacts of multiple exposures to humans, defendants argue that this project involves only one treatment per Area of Concern and thus does not present risks of multiple exposures. In any event, defendants argue the EIS considered this issue and found that "epidemiological studies as well as the long history of use" identified no hazard for members of the general public exposed to B.t.k. formulations. EIS/AR 5099 at App. H–6.

Defendants point out that Appendix H of the EIS discusses human health effects in hazard identification, exposure assessment, exposure-response assessment, risk characterization, cumulative effects, connected action, and group risks for the DFTM outbreak itself, for B.t.k. treatment, and for TM–BioControl treatment. EIS/AR 5099 at App. H–3 through H–8. Further, where previous insect suppression projects have occurred on national forests, the EIS discusses those treatments in the context of cumulative effects. EIS/AR 5099 at IV–61 through IV–63.

**(c)** *Discussion.*

■ I do not agree with plaintiffs that the EIS underestimates and/or ignores the cumulative effects of exposures to the insecticides. For example, the EIS contains the following discussions and references:

(1) Large-scale forest insect suppression projects have been conducted at various times throughout eastern Washington and Oregon for over 50 years. EIS/AR 5099 at IV–60 to IV–63. These operations have mostly targeted western spruce budworm and DFTM, and treatments were widely separated in space and time. *Id.* Because of the time intervals between treatments, cumulative impacts from previous insect suppression projects and the current project will be minimal. *Id.*

**1258**

(2) No area would be sprayed more than once either in the same or successive years, so repeated exposure is not expected. EIS/AR 5099 at IV–50.

(3) Appendix H to the EIS contains a discussion of the cumulative effect of the project as a whole (App.H–2) and discussions of the cumulative effects of B.t.k. (App.H–6) and TM–BioControl (App.H–8). The EIS relied upon cumulative exposure data in the Gypsy Moth EIS, which considered multiple applications because areas were often treated twice or three times. Since the DFTM project involves only one treatment in any area, the Gypsy Moth EIS assessment was actually addressing a more rigorous application in its conclusions that cumulative effects were not a cause of concern.

As plaintiffs note, the EIS does say that the effects of multiple exposures of B.t.k. over several years cannot be directly assessed (App.H–6), but plaintiffs fail to note that the EIS goes on to say that in the DFTM project the only group likely to be exposed to successive years of exposure to B.t.k. would be workers who happened to work on successive projects in different areas (App.H–7).

My review of the EIS indicates that it does consider and analyze the cumulative effects. Again, this court may not substitute its judgment as to the USFS' conclusions on this issue. Plaintiffs have failed to support their contentions on this issue.

**10. *True Scale of the DFTM Outbreak and Ensuing Harm.***

**(a) *Plaintiffs' Arguments.***

Plaintiffs argue that the EIS violates NEPA by mischaracterizing the data regarding the scale of the DFTM outbreak and the harm that will ensue from the outbreak, and thereby overstating the harmful impacts from the No Action alternative. According to plaintiffs, the "EIS creates the impression that there is one

massive infestation coming, that will hit all at once, and that is why there is an emergency." Pl. Memo., p. 20. Plaintiffs argue that defendants' own documents, data and survey results do not support this contention.

It is not disputed that populations of DFTM are monitored throughout Oregon and Washington using traps as an early warning system. EIS/AR 5099 at App. D–1. The traps are checked in the fall, and then ground surveys are done in spring to verify the populations. In the fall, populations are again monitored through cocoon/egg mass sampling and, finally, aerial surveying is done once a year to verify tree mortality and defoliation. EIS/AR 5099 at App. D–2. However, plaintiffs' position is that, with this early warning system, defendants should now know which areas will be sprayed and how many acres, and that under NEPA, defendants are required to provide the public with this information and disclose the site-specific impacts from the spraying. Thus, plaintiffs argue the EIS violates NEPA by (1) failing "to disclose what the spring 'rapping' surveys show" and how this compares to the amount of TM–BioControl available; (2) failing to state what the fall cocoon/egg mass surveys revealed; and (3) failing to state where there is visible defoliation. Pl. Memo., p. 21.

**(b) *Defendants' Arguments.***

Defendants argue that the EIS correctly documented the scale of the DFTM outbreak to the extent that it could be predicted. According to defendants, in 1998 the DFTM early warning system trapping summary for Oregon and Washington demonstrated a continued increase in moth trap catches, indicating an increase in populations. AR 604. The USFS' experts predicted significant defoliation for 2000 (AR 607), and aerial surveys for 2000 showed

approximately 220,000 acres of visible defoliation in northeastern Oregon (Rageno-vich.Decl., ¶ 13). The early warning system trapping summary includes maps of average numbers of moths caught, and discusses significantly increasing population trends in a cluster of plots in northeastern Oregon. AR 612–23. Because of these trends, early larval and egg mass sampling was also done in the Pine Ranger District of the Wallowa–Whitman National Forest during the spring and fall of 1998. *Id.* In north central Washington, the trap data showed a more generally distributed increasing population of DFTM caught in traps. *Id.*

According to defendants, plaintiffs mistakenly believe that the early warning system should have indicated the precise areas and acres needing to be sprayed. However, this is exactly what the early warning system was not intended to do. The EIS clearly states that the DFTM Early Warning System "is **not designed or intended** to predict exactly where the defoliation will occur; areas to be sampled on the ground should be selected on the basis of the impact of DFTM defoliation on management objectives."

EIS/AR 5099 at App. D–1 (emphasis in original). The actual areas proposed for spraying are determined by the intersection of the areas where defoliation is a management concern with the results of ground sampling.

According to defendants, plaintiffs' arguments about incomplete or unavailable scientific information focus on three items of information allegedly missing from the EIS and are without merit. Those three items are: (1) the results of "spring rapping" vis-a-vis the amount of TM–BioControl available; (2) the fall cocoon/egg mass survey information; and (3) the amount of visible defoliation.

First, defendants note that since the outbreak was predicted to occur beginning in the summer of 2000, and the EIS was finalized in the spring of 2000, information from the aerial detection surveys in the EIS was necessarily limited to 1999. In its discussion of the 1999 aerial survey, the EIS disclosed about 21,000 acres of visible defoliation on the Pine Ranger District of the Wallowa–Whitman National Forest. AR 5099 at III–27. (Defendants note that this area of visible defoliation has grown to about 220,000 acres after the 2000 summer season).

Further, defendants note that the ROD stated that fall 1999 surveys indicated a likely outbreak over 80,000 acres of Areas of Concern on the Umatilla and Wallowa–Whitman National Forests alone. ROD/AR 5533 at 3. The spring 2000 surveys, which would determine specific treatment areas, were not completed until early June. *Id.* Thus, the EIS, completed in the spring of 2000, could not specify exact treatment areas and, if the EIS and the ROD had been delayed until this information was available, it would have been too late to effectively treat an outbreak in 2000. According to defendants, this is why the USFS chose to examine the impacts over the estimated *maximum* treatment areas and, in fact, the amount of the 2000 spraying on the Umatilla and Wallowa–Whitman National Forests was less than one-half the acreage the fall 1999 surveys showed. Thus, the project as disclosed could not get larger, and defendants argue that plaintiffs should not be complaining that the project could, and has, gotten smaller.

With respect to plaintiffs' argument that the EIS creates the false impression that one massive infestation is coming, defendants argue that the EIS actually contradicts this impression. According to defendants, the USFS never said a DFTM outbreak would occur over the entire several million acres of host stands in nine

national forests in Oregon and Washington and, in fact, the USFS rejected detailed consideration of an alternative that would suppress the entire outbreak. EIS/AR 5099 at II–6.

**(c) *Discussion.***

■■■ I note the following references to this issue in the EIS:

(1) According to data from the early warning system, developed after the outbreak of DFTM in the 1970s, DFTM populations are increasing, and this trend appears to be more widespread than the previous localized outbreaks. EIS/AR 5099 at I–3.

(2) Appendix D to the EIS describes early warning trapping system and on-the-ground larval and cocoon/egg mass sampling procedures, which are used to determine actual populations levels within a specific area. EIS/AR 5099 at App. C–9, App. D–2.

The USFS has relied upon data and expert opinions that suggested that a widespread outbreak of DFTM is likely to occur in years 2000–2002 on nine national forests, and has used the early warning trapping system and cocoon/egg sampling procedures described in Appendix D to the EIS. It is clear that the USFS was not predicting an outbreak over the entire several million acres of host-type forest. However, irrespective of whether the outbreak reaches the proportions anticipated or not, the Proposed Action alternative selected by the Regional Forester proposes to spray only a maximum of 628,000 acres. EIS/AR 5099 at I–6. The number of acres actually sprayed will be fewer than 628,000 because spraying on any of the designated acres will only occur when monitoring indicates that the DFTM larvae have reached suboutbreak or outbreak populations. *Id.* The proposal that would have treated the entire outbreak (no matter what size it ended up being) was ex-

pressly rejected. Thus, I cannot agree that the USFS overstated the potential size of the outbreak and, even if it did, its proposal is limited in scope no matter what size the outbreak ends up being.

Since the EIS was completed in the spring of 2000, it had to rely on 1999 survey data since 2000 survey data would not be completed until June 2000. Exact treatment areas were determined on the basis of the 2000 data. Therefore, plaintiffs' arguments about defendants violating NEPA by using 1999 data in the EIS are not well taken.

Lastly, NEPA does not require a reviewing court to decide whether an EIS is based on the best scientific methodology available, nor does NEPA require the court to resolve disagreements among scientists as to methodology. *Oregon Environmental Council v. Kunzman,* 817 F.2d at 492. The USFS had the right to rely on its own methodologies for predicting the scale of the outbreak, and its own experts and their conclusions about the magnitude of the potential DFTM outbreak.

Plaintiffs' challenge on this issue is without merit.

**11. *Beneficial Role of DFTM.***

**(a) *Plaintiffs' Arguments.***

Plaintiffs argue that the EIS violates NEPA because "defendants do not disclose their own scientists' strong concerns regarding the importance of maintaining the natural role of the DFTM," and because defendants have ignored years of study by their own experts and researchers from Oregon State University and the US/FWS regarding the importance of DFTM to the ecosystem and the potential harm from attempting to control outbreaks. Pl. Memo., p. 25.

Basically, plaintiffs argue that the following information was ignored by defendants:

(1) USFS researchers reported that in general DFTM "plays a beneficial role, over the long term, as a regulator of forest primary production and is an essential part of the forest ecosystem"; that forests generally recover quickly from defoliation caused by DFTM; and that after 10 years "growth rates may surpass preoutbreak rates." AR 102, 111, 114, 126.

(2) The US/FWS noted that defoliation by DFTM could "increase production of Lepidopteran species ... [which] could form an important link in the food chain ..., increasing the prey base for bats, birds, and other insect predators." AR 3840.

(3) USFS researchers reported that in a DFTM outbreak, "[m]ore than one-half the total tree mortality is concentrated in patches ... that make up a relatively small portion of the outbreak area." AR 113.

(4) In a DFTM outbreak, the DFTM virus, which can live in undisturbed soil for decades, infects the DFTM and causes a natural crash in the outbreak within two to three years. EIS/AR 5099 at App. B–3 through B–3. DFTM virus reserves in the soil are completely eliminated when humans disturb the soil. EIS/AR 5099 at App. B–2, B–5, & B–6.

According to plaintiffs, these are the responsible opposing viewpoints that defendants have "swept under the rug," thereby violating NEPA and 40 C.F.R. § 1502.9(b).

**(b) *Defendants' Arguments.***

Defendants argue that the EIS discloses the beneficial impacts of the DFTM, and that defendants selected the Proposed Action alternative because it best supports the beneficial impacts of DFTM while protecting specific Areas of Concern.

Again, defendants argue that plaintiffs' arguments are contradictory because they cite to approximately 20 excerpts from the EIS regarding the beneficial impacts of the DFTM while making the argument that the EIS emphasizes only the damage caused by the DFTM. Since all of plaintiffs' evidence for beneficial impacts is the USFS' evidence, it is clear that the USFS did assemble information on beneficial effects and disclosed that information to the public.

Defendants also argue that the USFS did not make light of the forest health consequences of the No Action alternative. The ROD provides that for all of the several million acres of host stands where an outbreak might occur, the spray project has a maximum treatment possibility of 628,000 acres. ROD/AR 5533 at App., p. 3. Thus, the remaining untreated acres will, in effect, be subject to the No Action alternative. The 628,000 maximum possible acres of treatment are Areas of Concern that encompass acres of fish and wildlife habitat, old growth and late successional areas, recreation areas, municipal watersheds, and seed orchards that the USFS seeks to protect. Defendants argue that, in effect, plaintiffs are actually ignoring the benefits of protecting the Areas of Concern.

Defendants also dismiss plaintiffs' argument that the USFS did not consider the studies of its own experts on the beneficial impact of the DFTM, again noting that all plaintiffs' references to the beneficial aspects of the DFTM come from the USFS' own administrative record. Again, the Expanded Protection alternative that would have resulted in control of the entire outbreak was rejected early on because suppressing the entire outbreak "would not facilitate a long-term management strategy of allowing natural disturbances to re-

store overall ecosystem health." EIS/AR 5099 at II–6.

### (c) *Discussion.*

 It is clear from my review of the EIS that the beneficial effects of the DFTM were considered by the USFS in balancing the concerns about defoliation of certain sensitive areas (the Areas of Concern) against the benefits to long-term forest health of permitting the DFTM outbreaks to "crash" naturally. For example:

(1) The beneficial natural role of DFTM in the ecosystem is recognized in the EIS. EIS/AR 5099 at I–4, III–5, Chapt. IV (Effects Analysis-all sections), App. C–4.

(2) One of the factors instrumental in the selection of the Proposed Action alternative, which involves spraying of only those parts of the Areas of Concern affected by a DFTM outbreak, was the acknowledgment that outbreaks should be allowed to proceed naturally in most affected areas. *Id.*

(3) The Proposed Action results in treatment of approximately 12 percent of the several million acres that could experience a DFTM outbreak, allowing the outbreak in the remaining 88 percent to proceed naturally, in part because of the beneficial effects of the DFTM to long-term forest health. *Id.*

The EIS contains many references to it not being the desire of the USFS to halt the entire outbreak, recognizing the beneficial effects of DFTM. The USFS noted that the DFTM would be beneficial to the habitat of many species by acting as a natural disturbance agent and reducing overstocking and creating stand openings, but that defoliation in some areas would cause unacceptable harm to fish and wildlife habitat or areas where people live and work. EIS/AR 5099 at I–3; ROD/AR 5533 at 1. The EIS evidences that the USFS adopted the Proposed Action in an effort to seek balance between these competing concerns.

 With respect to plaintiffs' argument that defendants ignored important studies, it is not a violation of NEPA for the EIS to rely on particular scientific methodologies and studies instead of others. "NEPA does not require that we decide whether an [EIS] is based on the best scientific methodology available, nor does NEPA require us to resolve disagreements among various scientists as to methodology." *Friends of Endangered Species, Inc. v. Jantzen,* 760 F.2d at 986; see also 40 C.F.R. § 1502.24. "Our task is simply to ensure that the procedure followed by the [agency] resulted in a reasoned analysis of the evidence before it, and that the [agency] made the evidence available to all concerned." *Id.* The agency must have the discretion to rely on the reasonable opinions of its own qualified experts even if a court might find contrary views more persuasive. *Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 338, 109 S.Ct. 1835, 104 L.Ed.2d 351 (1989).

For these reasons, I conclude that plaintiffs' challenge on this issue is without merit.

### 12. *Risk of Compromising the DFTM's Strongest Natural Predator, the DFTM Virus.*

### (a) *Plaintiffs' Arguments.*

Plaintiffs argue that the EIS does not adequately address the catastrophic possibility of wiping out the DFTM virus in an area by killing the DFTM at the larval stage. Plaintiffs cite to the EIS for their argument that the virus on dead larvae do not make it back to the soil, but rather stick to the trees, resulting in the virus persisting only in DFTM adults. EIS/AR 5099 at App. B–2, B–4.

Plaintiffs argue that where information on impacts that have a low probability (wiping out the DFTM virus) but catastrophic consequences is lacking, the agency must include a summary of existing credible scientific evidence and an evaluation of the impacts. According to plaintiffs, defendants chose not to cite their own researcher's comments that larval-stage spraying could cause reduction or elimination of the DFTM virus. Thus, plaintiffs conclude, the EIS violates NEPA because it does not disclose the reasonable opposing view that the DFTM virus could be eliminated as a consequence of spraying, with potentially catastrophic consequences.

According to plaintiffs, the EIS also does not ensure that adjacent, untreated areas will be of adequate size to maintain the DFTM virus reservoir, because it gives discretion to each forest as to when and how much of an area to spray.

### (b) *Defendants' Arguments.*

As a threshold matter, defendants argue that plaintiffs have failed to exhaust their administrative remedies as to this issue because they did not raise it in their administrative appeal or their complaint.

In response to the argument that the spray project will create a hazard to the DFTM virus, defendants argue that a careful reading of Appendix B of the EIS explains the relationship of the DFTM virus, DFTM larvae, and soils. EIS/AR 5099 at App. B. Defendants argue that plaintiffs' assertion that the virus on dead larvae do not make it back to the soil is an erroneous interpretation of the discussion in Appendix B. According to the EIS, smaller larvae bodies remain glued to the foliage, where older larvae encounter the virus. A large amount of the virus is produced in these older larvae which, when they

die from virus infection, they hang; head down, with their posterior abdominal prolegs attached to the foliage. After death, they fall to a flower branch of the forest floor. They usually rupture, and their liquified body contents splatter into the organic litter on the forest floor or onto an adjacent branch.

EIS/AR 5099 at App. B–2. Defendants argue that no part of this discussion supports plaintiff's claim that "only virus in the DFTM adults persists" (Pl. Memo. at 27).

Defendants assert that because the spraying project is aerial, it does not disturb the soil duff and it is therefore irrelevant that the DFTM virus requires undisturbed soil duff.

Defendants acknowledge that the EIS does not promise additional research or monitoring on the reduction of virus in the forest ecosystems, and that to know for certain the precise impact of the three action alternatives, additional research and monitoring would be needed in this area. EIS/AR 5099 at App. B–6. However, defendants argue that since the entire outbreak is not being treated, additional research and monitoring is not required to make the decision to spray the Areas of Concern, and that such information is not "essential to a reasoned choice among alternatives" required by 40 C.F.R. § 1502.22(a).

### (c) *Discussion.*

My review of the EIS indicates the following references to this issue:

(1) The DFTM is kept in check by nature's own control mechanism, the DFTM virus, which attacks only the DFTM. EIS/AR 5099 at App. B–1.

(2) DFTM generally maintains levels that do not cause defoliation and lives in symbiosis with the forest. When there is a DFTM outbreak that escalates to defoliation, the DFTM virus infects the DFTM

and causes a end to the outbreak within two to three years. EIS/AR 5099 at App. B–2 to B–3.

(3) The DFTM virus requires undisturbed soil duff to survive between DFTM outbreaks. EIS/AR 5099 at App. B–2.

(4) Treatment may result in less virus being returned to the ecosystem in treated areas; however, virus would still be present in untreated areas and the overall ecosystem. EIS/AR 5099 at IV–41.

■■■ An environmental impact statement need not discuss remote and highly speculative consequences. *Trout Unlimited v. Morton,* 509 F.2d 1276, 1283 (9th Cir.1974). A reasonably thorough discussion of the significant aspects of the probable environmental consequences is all that is required by an environmental impact statement. *Id.* In this case, the EIS, citing to numerous scientific studies, documents its consideration of possible impacts on the DFTM virus and its conclusions regarding those impacts. EIS/AR 5099 at B–2 to B–3. This is all that NEPA requires them to do, and the court is not permitted to substitute its own judgment for that of the agency.

Plaintiffs' challenge on this issue is without merit.

**13. *Site–Specific Impacts.***

**(a) *Plaintiffs' Arguments.***

Plaintiffs argue that the EIS violates NEPA by not stating which specific areas will be treated, and thereby not addressing the site-specific impacts of spraying. It is plaintiffs' position that the EIS is too vague as to which areas will be treated, who gets to decide this, and the criteria upon which the decision will be based.

Plaintiffs also argue that the EIS is heavily reliant upon certain vaguely described mitigation measures such as the following: (1) that DFTM will not develop resistance to B.t.k. and/or TM–BioControl

because only isolated areas will be sprayed and those areas will be sprayed only every seven to eight years in the natural 10–year DFTM cycle (EIS/AR 5099 at App. B–6); (2) that the spraying process may be modified or mitigated in some unstated ways to protect sensitive wildlife (EIS/AR 5099 at App. G–3); and (3) that "the project logistics will be very complex" and will require helicopters sometimes to negotiate close turns and turn off booms to avoid spraying outside boundaries, being careful not to spray each area more than once, watching the weather closely, watching out for campers and recreationalists, and warning rangers (EIS/AR 5099 at App. G–1). Plaintiffs argue that whether these mitigation assumptions will work depends upon each forest's decision-making process and the skill level and conscientiousness of the helicopter pilots. These factors are not addressed in the EIS. Plaintiffs also argue that although weather observers and aerial observers will be present (EIS/AR 5099 at I–1), the monitoring plan in Appendix I is silent as to how each forest will regulate the size and location of the spray area and the effects on human health, wildlife, and other Lepidoptera. Plaintiffs argue that "deference to later, localized decision-making without a site-specific Environmental Assessment (EA) that is 'tiered' to the EIS thwarts NEPA and also undermines mitigation measures set forth in the EIS." Pl. Mem., p. 20. According to plaintiffs, site-specific environmental assessments must be prepared to allow for public comment and adequate decision-making, and that site-specific environmental assessments will inform the public of which spray areas have been surveyed and what wildlife species are located there.

Lastly, plaintiffs argue that the EIS fails to address the US/FWS recommendation that defendants "[c]onduct site-specific assessments of the effect of TM–Bio-Control and B.t.k. on non-target species,"

stating that it was "concerned that although numerous tests have been performed on the active ingredients of the proposed insecticides ... information regarding the surfactants is incomplete. Concerns include possible acute and chronic toxicity, endocrine disrupter effects, and other potential effects to non-target species." AR 5352.

### (b) *Defendants' Arguments.*

Defendants argue that there is no "later, localized decision-making," as alleged by plaintiffs; rather, the EIS clearly provides that only the implementation (but not operational logistics) are left to each forest.

Defendants argue that plaintiffs' repeated assertions that each forest will be allowed to decide where, when, and how to spray is incorrect. As to "where," defendants argue that the Proposed Action alternative that was selected clearly delineates the process for determining how many of the 628,000 maximum acres will be sprayed. The EIS provides that spraying will occur only: (1) where the increase to suboutbreak or outbreak levels of DFTM populations intersects with (2) areas identified to be Areas of Concern for defoliation because of vegetative conditions or substantial investments. EIS/AR 5509 at I–6. Populations levels are verified by cocoon/egg mass and larval surveys, and Areas of Concern were identified and mapped by each affected national forest at the predraft EIS "scoping" stage. EIS/AR at I–6 and App. C. Defendants argue that nothing is vague about these criteria or their intersection, and the areas of intersection are not something the USFS is able to predict in advance down to the day.

As to "when," the spraying must take place from mid-June to mid-July, when the larvae are actively feeding, and will take place in 2001, 2002, and possibly 2003 and 2004. EIS/AR 5099 at I–3. As to "how,"

the operational guidelines of the spraying are detailed in Appendix G, Project Guidelines, attached to the EIS. EIS/AR 5099 at App. G.

Defendants argue that the EIS is already site-specific, citing to a number of references in the EIS where there are specific analyses of specific species at specific sites that sometimes resulted in specific changes to parts of the spraying program.

Defendants concede the possible inclusion of "areas not specifically identified for protection," as explained in the EIS. EIS/AR at II–7. Irregularly-shaped "small isolated areas" may be included in spray blocks in mountainous terrain as a function of the safety and feasibility of operations, but will be avoided where it is practical and possible to turn off the spray equipment during application. EIS/AR at II–7. As to the rest of the millions of acres of potential outbreak levels, no spraying will occur because those acres do not intersect with Areas of Concern.

Defendants argue that the law does not require an EIS to have a detailed monitoring or mitigation plan, citing *Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 353, 109 S.Ct. 1835, 104 L.Ed.2d 351 (1989) (agency not required to have fully developed plan that will mitigate environmental harm before it can act) and *Ecology Center, Inc. v. U.S. Forest Service,* 192 F.3d 922 (9th Cir.1999) (no cause of action for failure of agency to monitor). Even so, defendants argue that the EIS actually provides for precisely the type of monitoring of the application and conduct of the project that plaintiffs claim does not exist. EIS/AR 5099 at App. I. Defendants note that the project is also monitored for effectiveness of treatment. *Id.* Defendants also argue that nothing in NEPA requires the USFS to include in an EIS an evaluation of the skill levels and conscientiousness of

helicopter pilots performing the spraying work.

Defendants point out that the first spraying occurred in June and July 2000, and plaintiffs have not challenged the decision-making process, the mitigation procedures, the weather or aerial observers, or the skill or conscientiousness of the helicopter pilots with respect to that first spraying.

Lastly, defendants argue that no site-specific environmental assessment is feasible or warranted in this matter. Plaintiffs suggest the site-specific assessment could be prepared after the fall sampling. Defendants point out that fall sampling helps narrow the potential outbreak areas, but the precise areas that will have outbreaks at a sufficient level to warrant spraying are not known until spring, and even into mid-June. EIS/AR 5099 at App. D 2.

**(c) Discussion.**

 My review of the EIS indicates that it defers some decisions to each individual forest, providing that each forest will develop its own project plan, including "how the public is to be notified of spray operations," specific safety concerns, and how monitoring will occur. EIS/AR 5099 at G 1. Further, the EIS defers decisions to individual forests when outbreak areas are too small to feasibly spray just those areas by air. In that case, each forest is to decide whether to drop those isolated areas from the spray plan or spray a larger area, even though only part of the area is infested. *Id.*

With respect to the DFTM project, the EIS cannot disclose precisely what areas will be treated each year because those areas are not known until the level of outbreak is assessed by the early warning system data, and subsequent ground sampling and aerial surveying. Thus, it is not feasible for defendants to disclose the site-specific impacts at the level plaintiffs desire.

I also conclude that site-specific environmental assessments are not required in this case. The EIS does a site-specific analysis of the *maximum* areas that could be sprayed because the precise areas are not known until shortly before spraying must begin. Thus, the EIS has already surveyed all areas that could be sprayed before any specific areas are chosen for actual spraying. The site-specific impact requirement has been met.

The mitigation measures do not appear to be vague or ill-defined, or too heavily dependent upon the discretion of each forest manager. Project guidelines and operational standards are fixed in the EIS. EIS/AR 5099 at G–1 (Project Guidelines). Implementation is up to each forest manager, but they are not permitted to decide when, where and how to spray as plaintiffs argue.

 This is not a case where defendants have delegated to each national forest the discretion about when, where, and how to use the insecticides. If it were, then plaintiffs' concerns about site-specific impacts might be more persuasive. Here, the when, where, and how decisions are made through the processes and requirements specified in the EIS and the ROD. The national forests only have discretion with respect to implementation of the spraying, i.e., posting of notices and warnings, logistics of the helicopter and aerial observer flights, etc. For these reasons, I conclude that site-specific environmental assessments are not required, or even feasible for this project. Site-specific environmental assessments are only required if new and significant environmental impacts arise that were not previously considered. *Salmon River Concerned Citizens v. Robertson,* 32 F.3d at 1356. Plaintiffs' challenge on this issue is without merit.

### 14. *Discussion of NEPA Claim.*

The USFS is required by NEPA to justify its process, not its decision. The duties that NEPA imposes upon agencies are procedural (*i.e.,* to analyze and disclose the environmental impacts of the proposed action), and not substantive environmental obligations. Once the EIS has analyzed the significant environmental impacts, the agency may decide affirmatively to incur those impacts in going forward with its decision. Although plaintiffs repeatedly argue that the EIS is conclusory and not exhaustive in its discussions of important issues, an exhaustive discussion is not the legal requirement. Rather, under the "rule of reason" standard, the EIS must contain only a reasonably thorough discussion of the significant aspects of the probable environmental consequences. *Oregon Environmental Council v. Kunzman,* 614 F.Supp. 657, 660 (D.C.Or.1985), citing *Trout Unlimited v. Morton,* 509 F.2d at 1283; *Salmon River Concerned Citizens v. Robertson,* 32 F.3d at 1356–57.

Further, plaintiffs' assertions often revolve around their position that the EIS is lacking in sufficient detail to support its conclusions. My review of the EIS indicates that it identifies and discusses the significant environmental impacts in sufficient detail, referring to supporting studies in many instances. It is well settled that supporting studies need not be physically attached to the EIS; they only need to be available and accessible. *Trout Unlimited v. Morton,* 509 F.2d at 1284. This requirement is met in this case. The EIS cites to approximately 230 references, and the administrative record is extensive (the index spans 102 pages and contains in excess of 1700 separate listings).

Plaintiffs are dissatisfied with the EIS's substantive recommendation to permit the use of the insecticides, but NEPA does not guarantee the substantive result. If the agency has taken the requisite "hard look" at the environmental issues raised by the project, and if the EIS has met NEPA's procedural requirements, then "an informed and deliberate agency decisionmaker is entitled to be arguably wrong." *Oregon Environmental Council v. Kunzman,* 817 F.2d at 496, quoting *North Slope Borough v. Andrus,* 642 F.2d 589, 599 (D.C.Cir.1980). As stated by the United States Supreme Court:

> It would not have violated NEPA if the Forest Service, after complying with the Act's procedural prerequisites, had decided that the benefits to be derived from downhill skiing at Sandy Butte justified the issuance of a special use permit, notwithstanding the loss of 15 percent, 50 percent, **or even 100 percent** of the mule deer herd. Other statutes may impose substantive environmental obligations on federal agencies, but NEPA merely prohibited uninformed-rather than unwise-agency action.

*Robertson v. Methow Valley Citizens Council,* 109 S.Ct. at 1846 (citations and footnote omitted) (emphasis supplied).

Although the EIS could arguably have been improved in a few respects (for example, possibly a more thorough discussion of drift), the record here demonstrates that the USFS has taken a "hard look" at the environmental consequences of the project, and has presented a reasoned analysis and disclosure of the evidence used in the preparation of the EIS and the ROD. The EIS contains at least "a reasonably thorough discussion" of the substantial issues raised by the project, with a multitude of references cited in the EIS and a voluminous administrative record. Defendants have balanced the competing concerns in its choice of the Proposed Alternative. That being the case, the court cannot intervene. *National Parks & Conservation Ass'n v. U.S. Dept. of Transp.,* 222 F.3d 677, 682 (9th Cir.2000).

I conclude that plaintiffs' motion for summary judgment on the issue of violation of NEPA is denied, and defendants' motion is granted.

### *DEFENDANTS' MOTION FOR SUMMARY JUDGMENT—SUBJECT MATTER JURISDICTION OVER CWA CLAIM*

Defendants move for summary judgment on the issue of whether the court has subject matter jurisdiction to consider plaintiffs' CWA claim. Since I have concluded that plaintiffs do not have a claim under the CWA, as discussed above, defendants' motion is denied as moot.

### *CONCLUSION*

For the reasons discussed above, defendants' motion to strike (doc. 44) is GRANTED; plaintiffs' motion for summary judgment (doc. 28) is DENIED as moot as to the emergency exemption claim and DENIED as to the NEPA and CWA claims; and defendants' motion for summary judgment (doc. 50) is DENIED as moot as to the emergency exemption and the CWA subject matter jurisdiction claims, and GRANTED as to the NEPA and CWA claims.

IT IS SO ORDERED.